McDONALD'S OF ZION, 432, ILL., INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8083–77—8109–77.     Filed June 11, 1981.

---

[1]The following cases have been consolidated for purposes of trial, briefing, and decision: McDonald's of Castro Valley, 433, Calif., Inc., docket No. 8084–77; McDonald's of Concord-Clayton, 434, Calif., Inc., docket No. 8085–77; McDonald's of San Leandro, 435, Calif., Inc., docket No. 8086–77; McDonald's of Oakland–12th St., 436, Calif., Inc., docket No. 8087–77; McDonald's of Alameda, 437, Calif., Inc., docket No. 8088–77; McDonald's of Pomona, 438, Calif., Inc., docket No. 8089–77; McDonald's of Grand Rapids–28th St., 439, Mich., Inc., docket No. 8090–77; McDonald's of Grand Rapids-Plainfield, 440, Mich., Inc., docket No. 8091–77; McDonald's of Grand Rapids-Division 441, Mich., Inc., docket No. 8092–77; McDonald's of Walker, 442, Mich., Inc., docket No. 8093–77; McDonald's of Bethany, 443, Okla., Inc., docket No. 8094–77; McDonald's of Midwest City, 444, Okla., Inc., docket No. 8095–77; McDonald's of Norman, 445, Okla., Inc., docket No. 8096–77; McDonald's of Oklahoma City–29th St., 446, Okla., Inc., docket No. 8097–77; McDonald's of Oklahoma City–39th St., 447, Okla., Inc., docket No. 8098–77; McDonald's of Oklahoma City-May, 448, Okla., Inc., docket No. 8099–77; McDonald's of Oklahoma City-Penn., 449, Okla., Inc., docket No. 8100–77; McDonald's of Oklahoma City–23d, 450, Okla., Inc., docket No. 8101–77; McDonald's of Tulsa, 451, Okla., Inc., docket No. 8102–77; McDonald's of Tulsa-Yale, 452, Okla., Inc., docket No. 8103–77; McDonald's of Tulsa–11th St., 453, Okla., Inc., docket No. 8104–77; McDonald's of Del City, 454, Okla., Inc., docket No. 8105–77; McDonald's of Moore, 455, Okla., Inc., docket No. 8107–77; McDonald's of Enid, 456, Okla., Inc., docket No. 8106–77; McDonald's of Kenosha, 457, Wis., Inc., docket No. 8108–77; McDonald's of Kenosha–52d St., 458, Wis., Inc. docket No. 8109–77.

*Sheldon I. Fink, Frederic S. Lane*, and *Steven W. Swibel*, for the petitioners.
*Seymour I. Sherman*, for the respondent.

HALL, *Judge*: Respondent determined deficiencies in petitioners' 1973 Federal income tax as follows:

| Petitioner | Docket No. | Amount of deficiency |
|---|---|---|
| McDonald's of Zion, 432, Ill., Inc | 8083–77 | $14,940 |
| McDonald's of Castro Valley, 433, Calif., Inc | 8084–77 | 22,766 |
| McDonald's of Concord-Clayton, 434, Calif., Inc | 8085–77 | 9,641 |
| McDonald's of San Leandro, 435, Calif., Inc | 8086–77 | 26,372 |
| McDonald's of Oakland, 12th St., 436, Calif., Inc | 8087–77 | 15,444 |
| McDonald's of Alameda, 437, Calif., Inc | 8088–77 | 14,677 |

McDonald's of Pomona,
438, Calif., Inc ...................................... 8089–77      $6,633
McDonald's of Grand Rapids–28th St.,
439, Mich., Inc ...................................... 8090–77      34,106
McDonald's of Grand Rapids-Plainfield,
440, Mich., Inc ...................................... 8091–77      28,487
McDonald's of Grand Rapids-Division,
441, Mich., Inc ...................................... 8092–77      12,285
McDonald's of Walker,
442, Mich., Inc ...................................... 8093–77      16,492
McDonald's of Bethany,
443, Okla., Inc ...................................... 8094–77      16,167
McDonald's of Midwest City,
444, Okla., Inc ...................................... 8095–77      16,752
McDonald's of Norman,
445, Okla., Inc ...................................... 8096–77      21,659
McDonald's of Oklahoma City–29th St.,
446, Okla., Inc ...................................... 8097–77      31,457
McDonald's of Oklahoma City–39th St.,
447, Okla., Inc ...................................... 8098–77      29,697
McDonald's of Oklahoma City-May,
448, Okla., Inc ...................................... 8099–77      29,237
McDonald's of Oklahoma City-Penn.,
449, Okla., Inc ...................................... 8100–77      33,796
McDonald's of Oklahoma City–23d,
450, Okla., Inc ...................................... 8101–77      23,760
McDonald's of Tulsa,
451, Okla., Inc ...................................... 8102–77      25,174
McDonald's of Tulsa-Yale,
452, Okla., Inc ...................................... 8103–77      16,457
McDonald's of Tulsa–11th St.,
453, Okla., Inc ...................................... 8104–77      25,892
McDonald's of Del City,
454, Okla., Inc ...................................... 8105–77      13,731
McDonald's of Moore,
455, Okla., Inc ...................................... 8107–77      15,203
McDonald's of Enid,
456, Okla., Inc ...................................... 8106–77      14,188
McDonald's of Kenosha,
457, Wis., Inc ...................................... 8108–77      23,257
McDonald's of Kenosha–52d St.,
458, Wis., Inc ...................................... 8109–77      28,133

Each petitioner obtained its assets from McDonald's Corp. following the latter's acquisition of those assets by merger. Due to concessions, the sole issue for decision is whether the transaction by which McDonald's Corp. obtained these assets qualified as a tax-free reorganization.

## FINDINGS OF FACT

At all pertinent times, each petitioner was a wholly owned subsidiary of McDonald's Corp. (McDonald's), a Delaware corporation. Each petitioner had its principal place of business in Oak Brook, Ill., when it filed its petition in these cases. All petitioners maintain their books and records on the accrual method and file their tax returns on a calendar year basis.

McDonald's and its subsidiaries operate, license, and service a system of self-service restaurants offering a substantially uniform menu. The McDonald's restaurant operations include proprietary outlets owned and operated by independent licensees or franchisees. Between January 1, 1968, and June 30, 1973, McDonald's acquired the stock or assets of corporations or other entities which owned an aggregate of 303 franchised restaurants.

Melvin Garb, Harold Stern, and Lewis Imerman (sometimes hereinafter referred to as the Garb-Stern group) first became involved with the McDonald's organization in the late 1950's when they obtained franchise rights to operate a restaurant in Saginaw, Mich. They subsequently expanded their McDonald's restaurant operations to include stores in other areas of Michigan, and in certain areas of Oklahoma, Wisconsin, Nevada, and California. Certain of the Garb-Stern restaurants were placed in wholly or partially owned subsidiaries of McDonald's Distributing Corp. (Distributing), a Michigan corporation, owned equally by Garb, Stern, and Imerman. Each subsidiary contained one restaurant. The remainder of the Garb-Stern interests were held by affiliated companies.[2] (Distributing, its subsidiaries, and the affiliated companies will sometimes be referred to collectively as the Garb-Stern Cos.)

Garb, Stern, and Imerman always owned equal shares in their McDonald's endeavors. They each owned one-third of the outstanding stock in Distributing as well as the same number of

---

[2]Each of the affiliated companies also held one restaurant. Garb, Stern, and Imerman owned a majority of the outstanding stock of most of the affiliated companies. The other shareholders of the affiliated companies and of the partially owned subsidiaries of Distributing generally consisted of individuals and trusts having a familial or business relationship with either Garb, Stern, or Imerman. Six of the affiliated companies qualified to be taxed under the provisions of subch. S. Because of the minor role played by shareholders other than Garb, Stern, or Imerman, and the relatively minor interest held by those shareholders, any reference to the Garb-Stern group will incorporate these other shareholders.

shares in each of the affiliated corporations in which they were shareholders. Any decision relating to their McDonald's interests generally required the unanimous approval of the group. Garb generally acted as the group's spokesman in its dealings with the McDonald's organization.[3]

In 1968, McDonald's, Distributing, Garb, Stern, and Imerman entered into an agreement whereby McDonald's acquired all the outstanding common stock of 14 subsidiaries of Distributing in exchange solely for $2.3 million par value, convertible, 6-percent preferred McDonald's stock. The preferred shares received by Distributing were not registered under the Securities Act of 1933 nor were they transferable for 2 years pursuant to the terms of the 1968 agreement.

For many years, the Garb-Stern group and the McDonald's organization maintained a congenial and successful relationship. The Garb-Stern group led by Garb, an outspoken and gregarious individual, became one of the largest and best-known franchisees within the McDonald's organization. Sometime after the 1968 transaction, however, the relationship between McDonald's and the Garb-Stern group soured.

In the fall of 1971, McDonald's and the Garb-Stern group met to discuss the possible acquisition by McDonald's of certain restaurants in Oklahoma. These negotiations proved to be unfruitful because accounting rules then in effect precluded McDonald's from treating the proposed acquisition as a "pooling of interests"[4] unless all the operations of the Garb-Stern group

---

[3] Imerman played a less active role in the group's business affairs than either Garb or Stern.

[4] For accounting purposes, there are two ways to account for the acquisition of one company by another. These are the pooling-of-interests method and the purchase method. The two methods are not elective; the characteristics of the acquisition determine which method applies.

The Accounting Principles Board (the predecessor of the Financial Accounting Standards Board) defined both methods in Opinion 16—Business Combinations, par. 12, pp. 284–285 (1970), wherein it stated:

"The pooling of interests method accounts for a business combination as the uniting of the ownership interests of two or more companies by exchange of equity securities. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents. Ownership interests continue and the former bases of accounting are retained. The recorded assets and liabilities of the constituents are carried forward to the combined corporation at their recorded amounts. Income of the combined corporation includes income of the constituents for the entire fiscal period in which the combination occurs. The reported income of the constituents for prior periods is combined and restated as income of the combined corporation.

were acquired. At that time, McDonald's was unwilling to acquire all of the Garb-Stern interests.[5]

The parties resumed their negotiations in November 1972 with a meeting at La Costa, Calif. At that meeting, the parties explored the possibility of McDonald's acquiring all the Garb-Stern Cos.[6] Most of the discussion at La Costa related to the nature and amount of consideration McDonald's would pay for the Garb-Stern interests. Garb, the spokesman for the group, indicated a desire for all cash. McDonald's, however, would only consider an acquisition that could be accounted for as a pooling of interests.[7] Under then-prevailing accounting rules, the acquisition could qualify as a pooling of interests only if McDonald's issued its common stock in exchange for the Garb-Stern interests.[8] McDonald's representatives suggested that the conflicting interests of both sides could be satisfied through the

---

"The purchase method accounts for a business combination as the acquisition of one company by another. The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair market values of tangible and identifiable intangible assets less liabilities is recorded as goodwill. The reported income of an acquiring corporation includes the operations of the acquired company after acquisition, based on the cost to the acquiring corporation."

The significance of the differences in these two accounting treatments is succinctly pointed out in a leading textbook:

"The popularity of the pooling concept in recent years can be attributed largely to two factors. The first is the opportunity for the parent company to acquire valuable assets and to record these assets at relatively low values as shown in the accounting records of the subsidiary company. As a result the consolidated earnings will not be penalized through amortization of higher (current) asset values against revenue. A second reason for the popularity of the pooling concept is that it permits a company whose stock sells at a high price-earnings multiple to show an *instant increase* in its earnings per share by issuing additional stock to acquire companies whose stock customarily sells at a low price-earnings multiple. A "growth" company may thus be able to maintain its reputation for reporting higher per-share earnings each year by continually acquiring other companies and accounting for such acquisitions on a pooling-of-interests basis. [W. Meigs, C. Johnson & R. Meigs, Accounting—The Basis for Business Decisions 682 (4th ed. 1977).]"

[5]At the 1971 negotiations, the parties also discussed the possibility of McDonald's redeeming or converting the preferred stock issued in the 1968 transaction. The Garb-Stern group proposed the conversion or redemption because they felt McDonald's had taken advantage of them in 1968. At that time, they accepted the preferred stock because of representations made by McDonald's that the company could not then issue common stock. Subsequently, the Garb-Stern group learned that McDonald's had in fact issued common stock in other acquisitions. Between 1968 and 1971, McDonald's common stock greatly increased in price.

[6]Prior to the La Costa meeting, McDonald's had concluded that the Garb-Stern group presented a divisive force in the McDonald's organization and a source of potential conflict. Accordingly, McDonald's believed it was in its best interest to totally end the Garb-Stern group's activities and interests as operators of McDonald's restaurants.

[7]See note 4 *supra.*

[8]See Accounting Principles Board, Opinion 16—Business Combinations, par. 47 (1970).

following procedure: McDonald's would acquire the Garb-Stern Cos. in exchange for McDonald's common stock, and McDonald's would permit the Garb-Stern group to include their shares for sale in a June registration then planned by McDonald's.[9]

The 2-day meeting at La Costa ended at an impasse primarily because the parties could not agree on the value of the Garb-Stern interests. By the conclusion of the meeting, however, both parties recognized that any eventual acquisition would be in exchange for McDonald's common stock.

In early March 1973, Stuart Greenberger, the attorney for the Garb-Stern group, met with McDonald's general counsel in order to convey an offer on behalf of the Garb-Stern group. On March 12, 1973, Greenberger wrote the following letter to McDonald's general counsel setting forth the basic terms of his clients' offer:

> As you requested, I am writing this letter in order to put in writing the basic terms of the "offer" which, on behalf of my clients, I transmitted to you at our breakfast meeting last Wednesday with respect to the sale by Messrs. Garb, Stern and Immerman [sic] (and the minority stockholders) of their interests in the McDonald's units, the Preferred Stock, the real estate and the related assets.
>
> Presumably the transaction would be structured as an "A" reorganization. It is imperative that the transaction be closed in time so as to permit McDonald's to be able to include the shares issued in the transaction in its next registration statement (which presumably will become effective in June 1973) without destroying the pooling of interests accounting treatment. McDonald's would agree, at our request, to include that portion of such shares as we may request in that registration statement. The total purchase price is to be McDonald's Common Stock having a value of $25,000,000. The stock is to be valued based upon the average of the closing prices of McDonald's stock on the New York Stock Exchange for the two weeks ended March 9, 1973. This offer is open only for a period of 7 days from the date of our meeting.
>
>     \*      \*      \*      \*      \*      \*      \*
>
> Certain of the real estate is not in the corporations and is not McDonald's related. We want to be free to elect (obviously prior to signing any agreement) to receive cash for that real estate in lieu of McDonald's stock. We understand that the allocation of value to that real estate would have to be fair and realistic.
>
>     \*      \*      \*      \*      \*      \*      \*
>
> There were a number of additional "minor" matters which I mentioned to

---

[9]From 1968 to 1972 McDonald's annually registered and sold shares to the general public. One of the purposes of these annual registrations was to afford acquired franchisees the opportunity to sell stock otherwise restricted under the securities laws. Since 1973, however, McDonald's has had only one equity registration.

you at our meeting which I presume need not be restated here. Of course, no binding obligation will arise with respect to this transaction until the execution of a definitive agreement.

McDonald's eventually accepted this offer.

In mid-March 1973, McDonald's independent accountants, Arthur Young & Co. (AY), and certain McDonald's employees traveled to Oklahoma City to review the accounting records of the Garb-Stern Cos. to determine the extent of the audit work that would have to be performed in connection with the proposed acquisition. If the proposed acquisition closed on or before March 31, 1973, then McDonald's quarterly report to the Securities and Exchange Commission (Form 10-Q), which was due on May 15 had to reflect the combined operations of McDonald's and the Garb-Stern Cos. Based on its review of the Garb-Stern Cos.' records, AY determined that it would not be practicable to complete an audit of the Garb-Stern Cos.' records in time to meet the May 15 deadline. Accordingly, AY recommended that the acquisition not be closed during the first quarter of 1973.

On or about March 17, 1973, AY advised McDonald's that in order to have a June registration in which the Garb-Stern group could sell their shares without destroying the pooling-of-interests accounting treatment, the financial statements to be incorporated in the June registration statement would have to include at least 30 days of post-merger results of operations for the Garb-Stern Cos.[10] If the 30-day period ended later than April 30, 1973, McDonald's could not have a June registration in which the Garb-Stern group could participate without destroying the pooling-of-interests treatment because McDonald's accounting system generated financial statements only at the end of each month, and a May 31, 1973, closing date would not allow sufficient preparation time for a June registration statement.

---

[10]This advice was premised on the Securities and Exchange Commission's Accounting Series Release No. 135 which read, in pertinent part, as follows:

"The Commission will henceforth consider that the risk sharing required for the applicability of pooling-of-interests accounting will have occurred if no affiliate of either company in the business combination sells or in any other way reduces his risk relative to any common shares received in the business combination until such time as financial results covering at least 30 days of post merger combined operations have been published. This would include all sales whether private or public. Publication of combined financial results can take the form of a post-effective amendment, a Form 10-Q or 8-K filing, the issuance of a quarterly earnings report, or any other public issuance which includes combined sales and net income."

In order to accommodate the concerns of each of the parties, it was essential that the proposed acquisition close at 12:01 a.m. on April 1, 1973. Both parties and their legal and accounting advisers directed their attention to meeting this deadline. Intensive around-the-clock drafting sessions occurred in the last few days of March 1973, in order to meet the targeted closing date. These sessions took place principally at Greenberger's law offices. Garb and Stern occasionally appeared at these sessions.

As of April 1, 1973, the Garb-Stern group knew that, absent unusual circumstances, McDonald's planned to file a registration statement in June of that year. The Garb-Stern group contemplated participating in the anticipated registration. McDonald's, however, did not legally commit itself to such a registration.

The Garb-Stern group intended to sell virtually all of the McDonald's stock they would eventually receive in the transaction. No member of the group, however, promised or obligated himself to sell any of the shares to be received. McDonald's was totally indifferent as to whether the Garb-Stern group retained or sold their stock.

The overall structure of the acquisition, as initially proposed, called for each Garb-Stern Co. (including Distributing's subsidiaries) to merge directly into McDonald's. Each restaurant would then be dropped down into a newly created operating subsidiary. After reviewing the proposed acquisition, AY recommended a change in its structure to protect McDonald's against possible adverse tax consequences which might result if the acquisition proved to be taxable. On or about March 29, 1973, McDonald's proposed the structural changes to the Garb-Stern attorneys who agreed to the changes only after McDonald's agreed to pay the extra legal expenses associated with the restructuring.[11] In its revised form, the acquisition called for Distributing's subsidiaries to be liquidated into Distributing prior to the April 1 closing date, followed by a merger of Distributing directly into McDonald's. All other aspects of the acquisition remained the same.

---

[11]The additional expenses were attributable to the redrafting of documents necessitated by the structural changes.

The drafting sessions culminated in an Agreement and Plan of Reorganization dated as of March 28, 1973 (the agreement).[12] McDonald's took over the assets and operations of all the acquired restaurants as of 12:01 a.m. on April 1, 1973.

In accordance with the last minute change in the transaction's structure, Distributing's 16 subsidiaries merged into Distributing followed by Distributing's merger into McDonald's. Each affiliate (except one, G.I.S.S., Inc.) merged into McDonald's, and G.I.S.S., Inc., merged into Franchise Realty Interstate Corp. (FRIC), a wholly owned subsidiary of McDonald's. Because April 1, 1973, was a Sunday, the appropriate merger documents were not filed until April 2 and 3, but the parties acknowledged and agreed that the effective time of the mergers was 12:01 a.m. on April 1, 1973.

As of April 1, 1973, McDonald's transferred to each newly formed subsidiary (petitioners herein) the business and assets consisting of one of the McDonald's restaurants acquired from the Garb-Stern group.[13] McDonald's and FRIC retained all assets of the Garb-Stern Cos. which were not dropped down into the McDonald's operating subsidiaries.

The agreement called for the Garb-Stern group to receive 361,235 shares of unregistered McDonald's common stock[14] as consideration in the transaction. McDonald's actually delivered these shares on May 29, 1973, after they were appropriately listed for trading on the New York Stock Exchange.[15] Each stock certificate issued to the Garb-Stern group bore the following legend: "The shares represented by this certificate have not been registered under the Securities Act of 1933, and cannot be

---

[12]Although the agreement was dated "as of" Mar. 28, 1973, the drafting of the agreement actually continued throughout Saturday, Mar. 31, and through the early morning hours of Sunday, Apr. 1.

[13]These transfers qualified under sec. 351 of the Internal Revenue Code. In addition to the petitioners herein, McDonald's formed four other subsidiaries and transferred to each a McDonald's restaurant which had been under construction by the Garb-Stern Cos. as of Apr. 1, 1973.

[14]On Apr. 2, 1973, the first day of trading after the Apr. 1 agreement, McDonald's stock closed at $66⅜ per share.

[15]The total number of shares amounted to less than one percent of McDonald's common stock outstanding at the time. Garb, Stern, and Imerman each received 100,513 shares which, in the aggregate, approximated 83 percent of the total shares received by the Garb-Stern group. See note 2 *supra*.

sold, transferred or distributed at any time except in compliance with the Agreement."

A significant portion of the agreement, i.e., article VII, focused on the rights and restrictions applicable to the shares received by the Garb-Stern group. That article provided in pertinent part:

### ARTICLE VII

#### No Distribution; Restriction on Transfer of McDonald's Stock

Section 7.1—*No Distribution.*

Each Stockholder represents and warrants that such Stockholder is acquiring the McDonald's Stock to be issued to such Stockholder hereunder for such Stockholder's own account without a view to or the intention of the distribution thereof, except in compliance with the Federal Securities Act of 1933 (the Act).[16] * * *

Section 7.2—*Not a Public Offering.*

Each stockholder acknowledges such stockholder's understanding that the McDonald's Stock to be issued pursuant to the Merger is not being registered under the Act * * * on the ground that the issuance of the McDonald's Stock pursuant to this Agreement is exempt under Section 4(2) of the Act as not involving a public offer * * *

Section 7.3—*Transfer Restrictions and Rights.*

(a) *Restrictions.* Subject to the further terms and conditions hereinafter set forth in this Article VII, each stockholder of each Company agrees that such stockholder will not offer for sale, sell, distribute or otherwise dispose of any shares of McDonald's Stock received pursuant to the Merger including the McDonald's Stock of such stockholder, if any, retained by McDonald's in escrow * * * until:

   (i)   such Restricted Stock is effectively registered under the Act and applicable state securities laws;

   (ii)   such Restricted Stock can be sold in compliance with Rule 144 under the Act * * * [17] or

   (iii)   such Restricted Stock can be sold or otherwise disposed of as set forth in subsection (b) hereof.

        *        *        *        *        *        *        *

Section 7.4—*Incidental Registration.*

If McDonald's at any time during the sixty calendar months next succeeding March 30, 1973 proposes to register any of its equity securities under the Act,

---

[16]The original draft of this section did not include the phrase "except in compliance with the [Act]." The phrase was added at the insistence of one of McDonald's attorneys to take into account the possibility that the Garb-Stern group might join in the registration planned for June 1973.

[17]Rule 144 generally requires a 2-year holding period before any of the restricted or unregistered shares may be sold. Once the holding period is satisfied, the rule limits the number of shares which may be sold during any 6-month period.

then at each such time it shall give written notice in the manner provided by section 7.11 hereof of its intention so to do to stockholders remaining subject to the restrictions provided for in Section 7.3 and upon written request of any stockholder given within fifteen days after receipt of such notice from McDonald's, McDonald's will in each instance, at its own expense * * * use its best efforts to cause all of the shares of Restricted Stock specified in such request to be registered under the Act; * * * . If there is an underwriting in connection with any such registration, the shares specified in the stockholders' requests may participate in such underwriting, except that, after one registration is offered to stockholders pursuant to this Section 7.4 if the managing underwriter for such registration recommends a limitation on the maximum number of shares or other securities to be covered by the underwriting, the shares specified in the stockholders' requests may participate in the same proportion as shares requested to be registered by other shareholders of McDonald's having incidental registration rights (similar to those described in this Section 7.4), but only after all securities for which McDonald's requests registration for its own account and all securities for which other shareholders of McDonald's require registration pursuant to contractual rights (similar to those described in Section 7.5), are covered. * * * In the event of such an underwriting, stockholders shall be required to sell, pursuant to the underwriting agreement executed by McDonald's in connection therewith, the total number of shares which have been registered for sale hereunder, but if any stockholder refuses to sell at the price proposed by the underwriter, then: (i) such stockholder may withdraw from the underwriting; and (ii) if such stockholder withdraws from the underwriting, McDonald's shall have the right to withdraw the shares being registered for sale by such stockholder from such registration statement and such stockholder shall not transfer such shares so withdrawn except in compliance with this Article VII.

*     *     *     *     *     *     *

The provisions of this Section 7.4 will not be deemed to impose on McDonald's any obligation to file a registration statement under the Act, to cause such registration statement to become effective, or to register any McDonald's Stock under the securities laws of any state.

Section 7.5—*Required Registration.*

(a) McDonald's agrees that, *unless*:

(i) March 31, 1973—March 31, 1974—(I) during the period commencing on March 31, 1973 and ending on March 31, 1974, it has filed a registration statement * * * and has given written notice of its intention to so file pursuant to Section 7.4 hereof, (II) such registration statement has been declared effective, and (III) pursuant to Section 7.4 hereof or otherwise stockholders would have been permitted to sell not less than seventy-five percent of the aggregate number of shares of Restricted Stock which stockholders advised McDonald's that they desired to sell pursuant to a registration statement, then (x) any stockholder or stockholders holding not less than fifty-one percent of the aggregate number of shares of Restricted Stock issued pursuant to all Mergers hereunder may give a written notice not later than April 15, 1974 to McDonald's requesting McDonald's to advise them

whether or not McDonald's intends to file a registration statement on or before June 30, 1974 pursuant to which such stockholder or stockholders shall register not less than 10,000 shares of Restricted Stock, McDonald's shall file a Registration Statement covering all such shares for which registration is requested not later than July 31, 1974 and will use its best efforts to have the Registration Statement declared effective.

(ii) April 1, 1974—March 31, 1975—(I) during the period commencing on April 1, 1974, and ending on March 31, 1975, it has filed a registration statement * * * and has given written notice of its intention to so file pursuant to Section 7.4 hereof; (II) such registration statement has been declared effective, and (III) pursuant to Section 7.4 hereof or otherwise stockholders would have been permitted to sell not less than seventy-five percent of the aggregate number of shares of Restricted Stock which stockholders advised McDonald's that they desired to sell pursuant to a registration statement, then (x) any stockholder or stockholders holdings not less than fifty-one percent of the aggregate number of shares of Restricted Stock issued pursuant to all Mergers hereunder may give a written notice not later than April 15, 1975 to McDonald's requesting McDonald's to advise them whether or not McDonald's intends to file a registration statement on or before June 30, 1975 pursuant to which stockholder or stockholders shall register not less than 10,000 shares of Restricted Stock, (y) if McDonald's shall not so advise stockholders on or before May 1, 1975, then (z) upon the written request, made on or before May 15, 1975, of a stockholder or stockholders with respect to not less than 10,000 shares of Restricted Stock, McDonald's shall file a registration statement covering all such shares for which registration is requested not later than July 31, 1975 and will use its best efforts to have the registration statement declared effective.

(b) McDonald's shall bear all expenses of such registration except for out-of-pocket expenses of the stockholders, fees of counsel for stockholders and stockholders' pro rata share of the registration fee of the Commission, underwriting discounts, commissions or fees, transfer taxes and escrow fees. * * * McDonald's shall be required to file only one registration statement pursuant to this Section 7.5. * * * If any stockholder or stockholders demand the filing of a registration statement pursuant to this Section 7.5 and (x) such stockholder or stockholders withdraw from such registration or (y) such registration statement becomes effective, then no stockholder shall have any further rights under this Section 7.5. Nothing herein shall compel any stockholder to sell pursuant to a registration statement requested pursuant to this Section 7.5.

\*        \*        \*        \*        \*        \*        \*

Section 7.10—*Non-Transferability of Registration Rights.*

The registration rights granted pursuant to the foregoing sections are personal to the stockholders and may not be assigned or transferred by them without the prior written consent of McDonald's except, however, that such rights shall be transferable upon the transfer of McDonald's Stock subject to the terms and conditions of Section 7.3 hereof by gift or valid testamentary transfer.

Greenberger specifically negotiated for the incidental regis-

tration rights (piggyback rights) and the demand registration right contained in the agreement. These rights were important and valuable to the Garb-Stern group in light of the significant amount of unregistered stock received by the group in the transaction. The rights provided the Garb-Stern group with flexibility with respect to their shareholdings.[18] The agreement also contained the following covenant:

Section 9.1—*Continuous Undertaking.*

It is understood that: (i) numerous disputes and antagonisms have developed between the parties hereto and (ii) the purpose of these covenants is to protect the goodwill of the assets being acquired and the goodwill of the McDonald's Corporation, its subsidiaries and its system of licensees whether or not connected with any assets acquired herein, by eliminating any future and settling current disputes which McDonald's believes have injured and caused difficulties within McDonald's system, and to preserve the integrity of and harmonious relationships within the McDonald's restaurant system. Accordingly, Stockholders severally covenant and agree: after March 31, 1973 and until March 31, 1994, they will not, and will not attempt to, directly or indirectly, in any capacity, including as owner, partner, shareholder or lessor, acquire or solicit or own or hold an equity, ownership or other financial interest in, or in any way control or participate in the management of, any McDonald's restaurant anywhere in the United States or elsewhere, except that from and after April 1, 1976, Stockholders may acquire up to a 30% ownership interest in any number of McDonald's restaurants, * * *

The total consideration paid to the Garb-Stern group reflected a $1 million to $2 million nuisance premium which McDonald's willingly paid to eliminate the Garb-Stern group from the McDonald's organization.

On April 20, 1973, McDonald's formally notified the Garb-Stern group pursuant to section 7.4 of the agreement that McDonald's was planning to file a registration statement. On April 24, 1973, Greenberger and an attorney for McDonald's discussed the April 20 notice and any ramifications which might result if the Garb-Stern group joined the registration and thereafter withdrew. McDonald's attorney advised Greenberger that, in his opinion, any withdrawal would eliminate the demand registration right held by the Garb-Stern group.[19]

---

[18]McDonald's paid no cash dividends on its common stock from 1968 through the time of the acquisition.

[19]McDonald's attorney also advised Greenberger that any substantial withdrawal could adversely affect McDonald's relationship with its underwriter.

On May 8, 1973, McDonald's publicly announced the proposed secondary offering of 600,000 shares of common stock. The Garb-Stern group's 361,235 shares were included in the May 8 announcement. On May 9, 1973, Greenberger notified McDonald's by telephone that the Garb-Stern group would include all their shares in the proposed registration.[20] Greenberger confirmed this in writing to McDonald's in a letter dated May 10, 1973. On May 22, 1973, McDonald's mailed letters to the Garb-Stern group asking them to confirm their desire to participate in the proposed registration. The Garb-Stern group sent written notices to McDonald's on June 4, June 6, and June 8 again confirming their intent to sell all of the 361,235 shares received by them pursuant to the acquisition.

On June 11, 1973, an article appeared in the Wall Street Journal commenting on a negative report on McDonald's stock then recently issued by a brokerage house. The article quoted the brokerage house report as recommending the aggressive sale of McDonald's common stock for a price above $50 per share.[21] The trading price of McDonald's stock thereafter dropped from the middle to high $60-per-share range to $52⅛ per share on June 25, 1973. McDonald's became concerned about proceeding with the secondary offering, and McDonald's investment advisers recommended its postponement. On June 26, 1973, McDonald's publicly announced that it was postponing the secondary offering. At no time prior to the postponement did any member of the Garb-Stern group indicate any desire to withdraw any of their shares from the proposed offering.

By July 11, 1973, McDonald's stock rebounded to the low $60 range and thereafter continued its recovery. On August 29, 1973, McDonald's notified the Garb-Stern group that the secondary offering was being reactivated. The Garb-Stern group again indicated its desire to be included in the registration. On September 17, 1973, McDonald's publicly announced a proposed secondary registration of approximately 950,000 shares, which included the Garb-Stern group's shares. On October 3, 1973, the Garb-Stern group participated in the McDonald's registration

---

[20]Garb and Stern were advised that they could withdraw from any proposed registration without affecting their right to join in a subsequent registration on a piggyback basis.

[21]On June 11, 1973, McDonald's stock closed at $64 per share.

and sold all but 100 shares of the McDonald's stock received in the acquisition. The price of McDonald's stock closed at $71⅜ per share on that day.

The agreement required the Garb-Stern group to prepare March 31, 1973, financial statements for each of the Garb-Stern Cos. and to prepare final Federal and State tax returns for the companies. The agreement further required that the final tax returns be submitted to McDonald's for review prior to filing. Arthur Andersen & Co., independent public accountants, prepared the appropriate financial statements which were audited by AY. The financial statements made no provisions for any potential Federal income tax liabilities due to depreciation or investment credit recapture.

Pursuant to the agreement, the Garb-Stern Cos.' accountants (principally Arthur Andersen & Co.) prepared and submitted the appropriate final tax returns. The returns prepared by Arthur Andersen were sent to AY for review in connection with their audit of the March 31, 1973, financial statements. The returns, as drafted, treated the McDonald's acquisition as nontaxable. Arthur Andersen made some changes in the returns subsequent to their review by AY, including the addition of a separate page setting forth information required by section 1.368-3, Income Tax Regs.[22] All the final tax returns were forwarded to McDonald's where they were signed and filed by an officer of the company.

On December 18, 1973, certain McDonald's officers met with AY representatives to discuss the manner in which McDonald's should report for tax purposes several acquisitions including the Garb-Stern transaction. As a result of that meeting, McDonald's decided to report the Garb-Stern transaction as a taxable acquisition.[23] McDonald's and its operating subsidiaries (petitioners herein) allocated the $29,039,000 purchase price to the acquired assets in the following manner: cash and other current assets were valued at book value; fixed assets were valued using

---

[22]The Federal tax returns prepared by accountants other than Arthur Andersen did not include the information required by sec. 1.368-3, Income Tax Regs.

[23]A McDonald's officer present at that meeting offered to compute the amount of recapture tax (investment credit and depreciation) which would be triggered by the taxable treatment. Under the agreement, McDonald's would be responsible for this additional tax assessable against the Garb-Stern Co's.

a replacement cost method based partially on a price index; and the residual amount, $16,307,671, was allocated to intangible franchise costs. Petitioners claimed depreciation and amortization expenses on their Federal tax returns based on the above valuations.

In his statutory notices, respondent determined that the Garb-Stern transaction was a tax-free reorganization. Consequently, respondent calculated petitioners' allowable depreciation and amortization expenses using carryover bases from the Garb-Stern Cos.

## OPINION

The sole issue presented is whether the merger of the Garb-Stern Cos. into McDonald's qualified as a tax-free reorganization requiring a carryover basis in the transferred assets. More specifically, the question to be resolved is whether the continuity-of-interest requirement was satisfied.

Petitioners contend that the Garb-Stern group (the shareholders of the transferor corporations, i.e., the acquired shareholders) harbored a premerger intent to sell virtually all of the McDonald's stock received pursuant to the merger. According to petitioners, the intention to sell, coupled with the actual sale of such stock at the earliest possible postmerger date, requires that the two transactions (the receipt of stock and its subsequent sale) be "stepped" together.[24] Respondent, however, asserts that the Garb-Stern group had not formulated their plans as to the sale or retention of the McDonald's stock at the time of the merger and, accordingly, the two transactions are unrelated and should not be stepped together. Moreover, respondent asserts that even if the Garb-Stern group intended to sell their McDonald's stock, this unilateral intent in the context of an arm's-length merger does not invoke the step-transaction doctrine.

Preliminarily,[25] we address whether, at the time of the

---

[24]The consequence of petitioners' theory is that the merger failed to satisfy the continuity-of-interest requirement. See pp. 994–995 *infra*.

[25]We address this issue first because petitioners' position is premised on the existence of the premerger intent.

merger, the Garb-Stern group intended to sell the McDonald's stock they received pursuant to that merger.[26] In our view, the overwhelming weight of the evidence indicates that the Garb-Stern group intended from the outset to sell their McDonald's stock at the earliest possible moment.

We reach this conclusion based on the cumulative effect of the following facts: First, when the transaction was initially proposed in November 1972 in La Costa, Calif., the Garb-Stern group expressed their desire for an all-cash deal.

Second, the potential breakdown in negotiations concerning the nature of the consideration (McDonald's insisted on an all-stock deal for financial accounting purposes) never materialized once McDonald's representatives explained to the Garb-Stern group how they could take stock and still get cash. See p. 978 *supra*.

Third, Garb, the leader and spokesman for the group, intended to sell all of his shares.[27]

Fourth, on March 12, 1973, the Garb-Stern group through their attorney notified McDonald's that it was "*imperative* that the transaction be closed in time to permit McDonald's to be able to include the shares issued in the transaction in its [proposed June] registration statement." The selection of an April 1 closing date and the around-the-clock activities this deadline necessitated were the direct result of the Garb-Stern group's demand for access to the proposed June registration. If the Garb-Stern group had had no intention to sell their stock, a later, more leisurely closing date could have been selected.

Fifth, certain last minute changes in the proposed Agreement and Plan of Reorganization (the agreement) reflect the belief, at least by some of those present at the negotiations, that the Garb-Stern group intended, or at least contemplated, the sale of their

---

[26] In ascertaining intent, this Court must necessarily rely rather heavily on objective facts under the theory that one's actions generally reflect one's intentions. Such reliance is also warranted by the "logic of tell-tale facts" when compared to "chameleon words." *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 418 F.2d 511, 519 (1969).

[27] Garb's own testimony, as well as the testimony of other parties to the transaction, indicates that he intended to sell from the outset. Although, at trial, Garb tried to hedge his intent by stating he wanted to sell at the "right price," he was evasive when asked what constituted the "right price." Moreover, his selling position remained intact despite a precipitous drop in the price of McDonald's stock on the eve of the proposed June registration. Consequently, we attach little, if any, significance to this statement.

McDonald's stock. The language of the investment-intent section of the agreement was changed to take into account the possibility that the Garb-Stern group might join in the proposed June registration. See note 16 *supra*. Moreover, the entire corporate structure of the acquisition was revised to reflect the possibility that the transaction might be taxable. See p. 980 *supra*. It is doubtful whether McDonald's representatives would have insisted on these modifications, especially the corporate realignment,[28] unless they believed that a subsequent sale by the Garb-Stern group was a real possibility. The natural sources for this belief were the members of the Garb-Stern group since any decision to sell was solely within the group's discretion.

Sixth, shortly after the merger (on May 9, 1973) the Garb-Stern group advised McDonald's of their intention to include all their merger shares in the proposed June registration.

Seventh, at no time did the Garb-Stern group indicate any desire to withdraw any of their shares from the proposed June offering despite the substantial slide in the stock's price just prior to the registration's postponement.[29]

Eighth, upon notification that the postponed June registration was being reactivated for October, the Garb-Stern group again elected to include all their merger shares in the revitalized registration.

Ninth, the Garb-Stern group sold all but 100 of the 361, 235 merger shares pursuant to the October 3, 1973, registration.

The above facts, when viewed in a realistic and objective manner, portray the direct and unwavering intent of the Garb-Stern group to sell virtually all of the McDonald's stock they received pursuant to the merger. Respondent disputes this characterization on two grounds. First, respondent argues that there was no consensus of opinion among the members of the Garb-Stern group as to whether to sell their individual shares and, therefore, it is erroneous to speak in terms of the group's

---

[28]The corporate realignment required the redrafting of the documents. Given the importance of the Apr. 1 closing date and the late date of the proposed realignment (Mar. 29), it is likely that the proposed realignment was based on a real concern that the transaction might be taxable.

[29]From Apr. 2, 1973, to June 25, 1973 (the day before the registration's postponement), the price of McDonald's stock fell from $66⅜ per share to $52⅛ per share. During the last 14 days of this period, the stock fell precipitously from $64 per share to $52⅛ per share.

intent. Second, respondent contends that even if the members of the Garb-Stern group had one frame of mind, the group had not solidified their intent to sell as of the time of merger, and all their actions prior to and subsequent to the merger merely reflected a desire to maximize the options that were available to them.

We first address respondent's lack-of-consensus argument. The record indicates that Garb, Stern, and Imerman always acted in concert with respect to their McDonald's interests; in other words, they were group-minded.[30] Respondent attempts to crack the group's solidarity by stating that, even if Garb intended from the outset to sell all of his shares, petitioners have failed to demonstrate that Stern and Imerman possessed the same intentions. We do not agree. Petitioners have more than adequately shown that Garb, Stern, and Imerman acted as a unit both prior to and subsequent to the merger. All of their actions throughout the negotiations, during the postclosing period, and on through the sale were unified and were consistent with the fact that such sale was always intended by the group. The chain of events, beginning with the group's initial request for a cash transaction and ending with their sale of the McDonald's stock at the earliest moment, evidences the group's intention. We do not believe that Stern's failure to solidify his plans at the time of merger warrants a different conclusion. Stern intended to sell some of his shares.[31] His indecision with respect to the remainder is dwarfed by the unwavering intention to sell expressed by Garb, the leader and spokesman of the group.[32] Moreover, we question how indecisive Stern's position was in light of the fact that his actions mirrored those of the group, e.g., he opted

---

[30]There is no evidence as to the role played by other members of the Garb-Stern group. See note 2 *supra*. But given the minority position of these individuals and the familial or business relationships between those individuals and Garb, Stern, or Imerman, we presume that the minority interests did not represent independent voices in this transaction. This presumption is given credence by the absence of any reference to the minority interests during the course of trial and the fact that the actions of the minority individuals mirrored those of Garb, Stern, and Imerman with respect to joining in both the postponed and the eventual registrations.

[31]In general, Stern's testimony was incredible or evasive and, accordingly, we attach little, if any, weight to it.

[32]Imerman's intention was not satisfactorily revealed in the record. Unlike Garb and Stern, Imerman was not called to testify. It appears, however, that his participation in the affairs of the Garb-Stern group and in the negotiations leading to the merger was more passive than either Garb's or Stern's. Consequently, in the absence of evidence to the contrary, we infer that Imerman's intent is reflected in the group's actions.

shortly after the merger to include all his shares in the postponed June registration and eventually sold all his shares pursuant to the October registration.

Respondent's second contention that the members of the group had not solidified their intention to sell at the time of merger and that all their actions prior to, during, and after the merger merely reflected a desire to maximize their options, must also be rejected. We recognize that many of the facts used to infer the group's intent to sell may be interpreted as merely maximizing the group's options with respect to their stockholdings. However, when all the facts are viewed in the aggregate, we believe the group's true intent to sell rises to the surface. For example, respondent claims that the Garb-Stern group elected to join in both the postponed June registration and the October registration because such action would, in effect, have given them a continuing option to sell or retain their stock. (The ability to "unplug" from any registration upon 24-hours' notice created this option.) We do not believe, however, that the Garb-Stern group elected to join these registrations with open minds. As a consequence of the election, the group exposed their demand-registration right to potential forfeiture. See pp. 985–986 *supra*. It is incredible that Garb, Stern, or Imerman, who held nondividend paying stock which comprised a substantial part of his assets, would be willing to chance the forfeiture of his single demand-registration right unless he intended to sell his stock pursuant to the proposed registrations.[33]

Having found the existence of a premerger intent to sell, we must next determine whether the subsequent sale of virtually all of the merger shares pursuant to that intent causes the underlying merger to fail the continuity-of-interest test.

In addition to specific statutory requirements, a reorganization under section 368(a)[34] must also satisfy the continuity-of-

---

[33]Furthermore, respondent claims that any decision to sell was contingent on the postmerger market price of the stock and not based on any notion of a premerger intent. The facts, however, belie this assertion. At no time during the substantial decline in the price of McDonald's stock from June 14 to June 25, 1973 (the day before the postponement of the proposed registration), did any member of the Garb-Stern group express any interest in withdrawing any of his shares from the proposed registration.

[34]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

interest test which has been judicially grafted onto the reorganization definitions. See sec. 1.368–1(b), Income Tax Regs.[35] The parameters of the continuity-of-interest test have evolved from a series of Supreme Court decisions. See generally *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942); *LeTulle v. Scofield*, 308 U.S. 415 (1940); *John A. Nelson Co. v. Helvering*, 296 U.S. 374 (1935); *Helvering v. Minnesota Tea Co.*, 296 U.S. 378 (1935); *Pinellas Ice & Cold Storage Co. v. Commissioner*, 287 U.S. 462 (1933). These cases hold that continuity exists when (1) the nature of the consideration received by the transferor corporation or its shareholders ("the acquired shareholders") confers a proprietary stake in the ongoing enterprise, e.g., receipt of preferred or common stock, and (2) that the proprietary interest received must be definite and material and must represent a substantial part of the value of the property transferred.[36] The underlying purpose of the continuity-of-interest test is to limit the nonrecognition provisions accompanying reorganizations to those situations where the acquired shareholders substantially and qualitatively continue their investment in the ongoing enterprise. See sec. 1.368–2(a), Income Tax Regs.; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.01, p. 14–4 (4th ed. 1979).

The entire consideration received by the Garb-Stern group pursuant to the April 1, 1973, merger consisted of McDonald's common stock. The parties agree that, in form, the nature and amount of this consideration clearly satisfied the continuity-of-interest test. However, they do not agree on the effect that the group's subsequent actions have on this apparent continuity.

Petitioners assert that the two events, the merger and the subsequent sale, should be stepped together. The consequence of their position would be to treat the Garb-Stern group as having received all cash as of the date of merger and, therefore, the merger would fail the continuity-of-interest test. Respondent

---

[35]The significance of the judicial continuity-of-interest test has been somewhat supplanted by stricter continuity requirements statutorily mandated for certain types of reorganizations. See secs. 368(a)(1)(B), 368(a)(1)(C), 368(a)(1)(D), and 368(a)(2)(E). Moreover, the continuity-of-interest test has been held inapplicable to "E" reorganizations. See *Hickok v. Commissioner*, 32 T.C. 80 (1959); Rev. Rul. 77–479, 1977–2 C.B. 119.

[36]Although the continuity-of-interest test was developed judicially, Congress has recognized its existence and has commended its use by the courts. See H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B (Part 2) 554, 564.

contends that the two events should be treated as separate transactions. Each side cites us to numerous cases involving various formulations and applications of the so-called step transaction doctrine.

Petitioners urge us to adopt the "end result" test whereby "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 418 F.2d 511, 516 (1969). See also *Redding v. Commissioner*, 630 F.2d 1169, 1175 (7th Cir. 1980), revg. 71 T.C. 597 (1979).[37] Applying this test to the present facts, petitioners argue that the Garb-Stern group's intention from the outset to sell their McDonald's stock as soon as possible, coupled with the group's effectuation of their plan, requires us to treat the merger as a complete cash-out, i.e., to disregard the group's receipt and retention of McDonald's stock from April 1 to October 3, 1973.

In opposing the application of the step transaction doctrine, respondent focuses on McDonald's relationship to the subsequent sale. He contends that unless McDonald's was a party to the subsequent sale, the unilateral actions by the Garb-Stern group could not retroactively disqualify the earlier arm's-length reorganization. In essence, respondent argues that a subsequent sale should not be stepped together with the prior arm's-length merger unless that subsequent sale is "part of the initial transaction," or "part of the deal between the parties." As applied to the facts in this case, respondent refutes the application of the step transaction doctrine because:

> The documents governing the merger transaction do not purport to require the [Garb-Stern] shareholders to sell all or any part of their McDonald's stock, or even arguably suggest that any such sale is part of the "deal" between the parties. Nor is there any contention of a "side" agreement or other understanding, whether legally binding or not, with respect thereto.

For the reasons stated below, we hold that the merger and the subsequent stock sale should not be stepped together. Although

---

[37]See also this Court's opinion in *Redding v. Commissioner*, 71 T.C. 597, 610 (1979), revd. 630 F.2d 1169 (7th Cir. 1980), cert. denied 450 U.S. 913 (1981).

this result is in accord with respondent's position, we do not wholly embrace respondent's analysis.[38]

The mere fact that the step transaction doctrine is an extremely useful judicial device to reach the substance of a given transaction does not mean that it should be invoked indiscriminately. Given the myriad cases involving the step transaction doctrine and the looseness of the language used in some of those cases, it is not surprising to find cases which, at least superficially, beckon us to apply the step transaction doctrine here. However, we must look beyond the surface to discern whether the step transaction doctrine should be applied to this specific situation. In other words, the doctrine ought to take into account the substantive issue being addressed. See *Redding v. Commissioner*, 630 F.2d 1169, 1177 (7th Cir. 1980); *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 418 F.2d 511, 516 (1969); *Kass v. Commissioner*, 60 T.C. 218, 266 (1973), affd. without opinion 491 F.2d 749 (3d Cir. 1974). See also Mintz & Plumb, "Step Transactions in Corporate Reorganizations," 12 N.Y.U. Inst. on Fed. Tax. 247, 285 (1954).

The substantive issue in this case is continuity of interest. Because our decision whether to apply the step transaction doctrine will determine the existence or nonexistence of continuity, it is incumbent upon us to more fully examine the continuity principle so that we may tailor the step transaction doctrine to its needs.

This examination must begin by asking whether all dispositions subsequent to a merger offend the continuity principle thereby reducing the amount of continuity deemed to be present at the time of the merger. If the answer is yes, then we need go no further for in our case it is clear that the Garb-Stern group sold all of their stock after the merger. If, however, a subsequent disposition does not by itself offend continuity, then we should ask why not. The answer to this latter inquiry will help

---

[38]Under the facts of this case, we need not decide whether a subsequent sale may only be integrated with the prior merger if it was "part of the deal" between the parties to the merger and, accordingly, we leave that question for another day. However, we observe that it is at least questionable whether respondent's position is tenable considering that (1) continuity of proprietary interest has historically focused solely on the acquired shareholder, and (2) prior cases have permitted otherwise valid reorganizations to be destroyed by the unilateral actions of one of the parties to the reorganization. See, e.g., *Anheuser-Busch, Inc. v. Commissioner*, 40 B.T.A. 1100, 1107 (1939), affd. 115 F.2d 662 (8th Cir. 1940).

ensure that whichever step-transaction approach is adopted will be tailored to the needs of the continuity principle.

In the context of acquisitive reorganizations and, more specifically, in the context of "A" reorganizations (statutory mergers and consolidations), there has been a dearth of judicial authority as to the effect on continuity of postmerger dispositions by the acquired shareholders.[39] In this regard, the cases responsible for the evolution of the continuity test are not helpful because they focus only on the nature and amount of the consideration received on the date of the merger. Nevertheless, the Internal Revenue Service,[40] the commentators,[41] and at least one court[42] all agree that a postmerger disposition, even within a short interval, will not break continuity if the disposition is

---

[39]Only two "A" reorganization cases have been brought to our attention. See *United States v. Adkins-Phelps, Inc.*, 400 F.2d 737 (8th Cir. 1968); *Heintz v. Commissioner*, 25 T.C. 132 (1955). Cf. *General Housewares Corp. v. United States*, 615 F.2d 1056 (5th Cir. 1980) (subsequent sale of 25 percent of stock received pursuant to a "C" reorganization).

[40]See Rev. Rul. 66–23, 1966–1 C.B. 67, 68, wherein it states:

"Further, if in fact X does sell some or all of the Z shares within five years of the date of the reorganization, the status of the reorganization will not be affected, since at the time of the reorganization X had no preconceived plan or arrangement for such sales."

Cf. Rev. Rul. 56–345, 1956–2 C.B. 206 (sale of 26 percent of stock received pursuant to a "C" reorganization within 1 month of the reorganization; *held*, the disposition does not taint the validity of the reorganization).

[41]See, e.g., B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.11, p. 14–25 (4th ed. 1975); Vrooman, "Corporate Acquisitions— (A) Reorganization, 77–3d Tax Management A14–15 (1974); Faber, "Continuity of Interest and Business Enterprise: Is it Time to Bury Some Sacred Cows," 34 Tax Law. 239, 263 (1981); Freling & Martin, "Current Reorganization Techniques," 55 Taxes 852, 864 (1977); Bloom & Sweet, "How IRS Uses Continuity of Interest to Raise New Problems in Reorganizations," 45 J. Tax. 130, 133–134 (1976).

[42]In *United States v. Adkins-Phelps, Inc.*, 400 F.2d 737 (8th Cir. 1968), Mrs. Weinmann, the principal stockholder of the transferor corporation in an "A" reorganization, received solely stock of the transferee corporation. Pursuant to the terms of the merger agreement, all the shareholders of the transferee corporation including Mrs. Weinmann, agreed not to transfer their stock without first offering the stock to the transferee corporation for its par value of $1 per share. Mrs. Weinmann subsequently sold all of her stock to the transferee corporation at its par value. The court, in a forthright opinion, held that neither the option granted to the transferee corporation nor the subsequent sale by Mrs. Weinmann caused the merger to fail the continuity-of-interest test. As stated by the court:

"The [merger] agreement placed Mrs. Weinmann under no obligation to sell the stock to the other shareholders. She had a complete right to continue to hold the stock. * * * The fact that Mrs. Weinmann inprovidently, at her insistence and against contrary advice, sold her stock to [the transferee corporation] is not material to the issue here. The determination of the substantiality of the stock interest must be upon the basis of the situation existing at the time of the merger. [400 F.2d at 741.]"

There is no indication in the facts whether Mrs. Weinmann formulated her intent to sell before or after the merger.

unrelated to the merger. Implicit in these positions is a belief that the continuity-of-interest test by itself does not require any length of postmerger retention. We agree with this approach.

The crux of the continuity-of-interest test lies in the continuation of the acquired shareholders' proprietary interest. See *LeTulle v. Scofield*, 308 U.S. 415, 420–421 (1940); *Neville Coke & Chemical Co. v. Commissioner*, 148 F.2d 599, 603–604 (3d Cir. 1945). The retention of such an interest ensures that the acquired shareholders' investment remains sufficiently "at risk" after the merger to justify the nonrecognition tax treatment.[43] In other words, having entered the merger as shareholders of the acquired corporation, they must exit as shareholders in the acquiring corporation.[44] However, once they have acquired a sufficient proprietary interest in the ongoing enterprise, the acquired shareholders should subsequently be free to do what they may with that interest without affecting the reorganization status of the transaction. Just as they were free to dispose of their shares in the premerger enterprise, so should they be free to dispose of those shares in the postmerger enterprise.[45] While Congress could statutorily mandate a postmerger holding period for qualified reorganizations, such a requirement is not presently part and parcel of the continuity test.[46]

With this in mind, we believe that the "mutual interdependence test" as endorsed by this Court in *American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), affd. per curiam 177 F.2d 513 (3d Cir. 1949), cert. denied 339 U.S. 920 (1950), and as followed on numerous subsequent occasions,[47] is best suited to

---

[43]In this case, there is no dispute that the nature of the consideration received by the Garb-Stern group, i.e., all common stock, exposed their investment to those risks generally associated with being a shareholder. For example, the price of McDonald's common stock fluctuated from $66⅜ per share on Apr. 2, 1973, down to $52⅛ per share on June 25, 1973, and up to $71⅜ per share on Oct. 3, 1973. See also notes 52 & 53 *infra*, and accompanying text.

[44]Of course, in triangular reorganizations the acquired shareholders must become shareholders in the controlling corporation.

[45]Of course, facts different from those presented may necessitate a different result, for example, if the Garb-Stern group were contractually bound to sell their McDonald's stock at a price certain, or if a premerger disposition were to the "wrong" party. Compare *Kass v. Commissioner*, 60 T.C. 218 (1973) (premerger acquisition by acquiring corporation), with Rev. Rul. 68–562, 1968–2 C.B. 157 (premerger acquisition by acquiring corporation's majority shareholder).

[46]Indeed, if the continuity principle tries to ensure a substantial carryover of proprietary attributes, there is no reason why, absent compelling reasons to the contrary, the valuable attribute of transferability should not be permitted to carry over.

[47]Petitioners argue that we should not rely on *American Bantam Car Co. v. Commissioner*,

provide a frame of reference against which to measure the "stepability" of the present transactions.[48] According to this test, two transactions will be stepped together if they are so interdependent that the legal relations created by the first would have been fruitless without the second. See generally *Redding v. Commissioner*, 630 F.2d 1169, 1177 (7th Cir. 1980); *Yamamoto v. Commissioner*, 73 T.C. 946, 955 (1980); *Palmer v. Commissioner*, 62 T.C. 684, 692 (1974), affd. 523 F.2d 1308 (8th Cir. 1975); *Dunlap & Associates v. Commissioner*, 47 T.C. 542, 550 (1967); *American Bantam Car Co. v. Commissioner, supra* at 405.

In the present case, the two transactions were independent. The merger transaction did not require or commit the Garb-Stern group to sell their McDonald's stock.[49] At the time of the merger, there was no assurance that the Garb-Stern group

---

11 T.C. 397 (1948), affd. per curiam 177 F.2d 513 (3d Cir. 1949), cert. denied 339 U.S. 920 (1950), and its progeny because those cases generally involve secs. 351 and 368(a)(1)(D). We recognize that those "subsequent disposition" cases differ from the present in terms of the statutory language (secs. 351 and 368(a)(1)(D) require control "immediately after" the transfer or exchange) and the factual settings (generally the transferor and transferee in those transactions are, in some sense, related). Nevertheless, we believe the cases are sufficiently analogous to warrant their use herein. However, given the aforementioned scarcity of judicial authorities in the context of "A" reorganizations and the infinite factual permutations which are possible, we decline at this time to incorporate the entire body of law that has developed in the sec. 351 and the sec. 368(a)(1)(D) arenas. See, e.g., *Intermountain Lumber Co. v. Commissioner*, 65 T.C. 1025 (1976).

[48] We reject petitioners' "net result test" in this situation because we find it too simplistic and not sufficiently attuned to the continuity test. As we have tried to point out, the continuity test is not designed to be a restraint on the alienability of the acquired shareholders' interests in the ongoing enterprise. Rather, it is merely intended to ensure that they receive a substantial proprietary interest in the ongoing enterprise without any prior commitment to dispose of it. To say that a premerger intent to sell necessarily poisons an otherwise valid reorganization would be expanding the bounds of the continuity test beyond its original purpose.

Reliance on an intent test is also unsatisfactory from an administrative viewpoint. For instance, in applying an intent test, how firm does the intent have to be? Will a fleeting thought be enough? Or a mere possibility? Furthermore, the existence of intent will surface only when it suits the parties. The Government could never be the beneficiary of a party's premerger intent unless we construct a presumption of intent by virtue of the timing of the subsequent sale. But this in itself would put a cloud on postmerger transfers which is not mandated by the continuity test. Moreover, an intent test would discriminate between shareholders of closely held corporations and those of publicly held corporations. From a practical standpoint, it is only in the closely held situations where the intents of the acquired shareholders are discernible.

[49] The absence of any commitment or promise to sell is reinforced by McDonald's indifference as to whether the group sold or retained their shares. If some sort of agreement or understanding had been reached, McDonald's would not have taken a cavalier attitude toward such subsequent events. Moreover, the mere fact that the merger agreement provided the group with the opportunity to participate in McDonald's postmerger registrations does not imply the existence of any kind of commitment or understanding between the parties as to

would sell. The decision to sell or to retain the McDonald's stock rested solely in the hands of the Garb-Stern group. They had unfettered discretion, within the constraints of the securities laws, to do with those shares as they wished.[50] The fact that the Garb-Stern group intended to sell their stock and eventually sold it at the earliest possible moment should not obscure the discretionary nature of the sale. Cf. *Stephens, Inc. v. United States*, 464 F.2d 53, 66–67 (8th Cir. 1972); *Wilgard Realty Co., Inc. v. Commissioner*, 127 F.2d 514, 516 (2d Cir. 1942); *Farr v. Commissioner*, 24 T.C. 350, 367–368 (1955); *National Bella Hess, Inc. v. Commissioner*, 20 T.C. 636, 647–648 (1953), affd. 220 F.2d 415 (8th Cir. 1955); *Schweitzer & Conrad, Inc. v. Commissioner*, 41 B.T.A. 533, 543–544 (1940); *Fifth Avenue Bank of New York, Executor v. Commissioner*, 31 B.T.A. 945, 950 (1934); *Ward v. Commissioner*, 29 B.T.A. 1251, 1254 (1934), affd. 79 F.2d 381 (8th Cir. 1935).[51] Furthermore, the merger was not contingent on the subsequent sale by the Garb-Stern group. It is clear to us, especially in light of McDonald's indifference toward the subsequent sale, that the merger was cemented as of April 1, 1973, irrespective of the subsequent sale. See *Dunlap & Associates, Inc. v. Commissioner*, 47 T.C. 542, 551 (1967); *Scientific Instrument Co. v. Commissioner*, 17 T.C. 1253, 1259–1260 (1952), affd. per curiam 202 F.2d 155 (6th Cir. 1953). Moreover, nothing in the nature or extent of the ownership rights of the stock held by the Garb-Stern group indicates anything but an independent transaction. The stock possessed all the normal attributes of common stock and was subject to the vicissitudes of the marketplace.[52]

Our refusal to step these transactions together is consonant

---

subsequent sales. The obtaining of incidental and/or demand registration rights is common in situations like the present and serves to provide the acquired shareholders with needed flexibility.

[50]For example, McDonald's had to obtain the consents of the group's members before any of the group's shares could be included in the proposed registrations. Furthermore, the group could have unilaterally "unplugged" from any registration on 24-hours notice.

[51]Not only was there no assurance that the Garb-Stern group would sell, there was a possibility that they would not be able to sell. Under the merger agreement, McDonald's expressly disavowed any obligation to have a subsequent registration of its stock. Without such a registration, the Garb-Stern group would have been unable to force a sale of their stock until either June or July 1974. See sec. 7.5(a)(i) of the merger agreement on pp. 983–984 *supra*.

[52]A different situation might be presented if the stock received by the acquired shareholders were stripped of the normal attributes of ownership and the sales price of the subsequent sale was guaranteed by the transferor corporation.

with the continuity test. The discretionary nature of the group's postmerger sale makes the present situation analogous to other postmerger sale situations (see pp. 996–998 *supra*), and warrants the same result.[53]

Petitioners rely heavily on *Heintz v. Commissioner*, 25 T.C. 132 (1955), in support of their position.[54] The basic facts of the *Heintz* case are stated succinctly on pages 141–142 of that opinion:

petitioners, after unsuccessfully attempting to sell their stock in Jack & Heintz, Inc., in an all cash deal, finally settled for approximately $5,000,000 in cash plus 60,000 shares of preferred stock in the corporation which was organized by the purchasing group to make the purchase [Precision Products Corp.]. Essential to this arrangement was the promise made to petitioners by members of the purchasing group that the preferred stock being paid to petitioners as part of the consideration would shortly [within 30 days] thereafter be sold on their behalf together with a public offering of the purchasing corporation's own preferred stock. Pursuant to the plan conceived by the purchasing group, petitioners caused their corporation to amend its profit-sharing plan and had its board of directors give its approval to the purchasing group's plan to merge Jack & Heintz, Inc., into Precision. [This occurred in March 1946.] On the day following the exchange of petitioners' stock in Jack & Heintz, Inc., for cash plus stock in Precision, the former company was merged into the latter. * * * This was followed by a public offering of Precision's common stock through which Precision obtained $8,525,000 of additional capital. However, due to the underwriter's insistence that the market for preferred stock was too weak at that time, the promoters of Precision were unable to fulfill their oral promise to petitioners that petitioners' preferred shares in Precision would be included at public offering. Private sales were, therefore, arranged by the promoters of Precision and, on

---

[53]We observe that, in the present case, it is indisputable that the Garb-Stern group actually received McDonald's stock pursuant to the merger. After all, they bore the risk of the marketplace and their consents were required before any sale occurred.

[54]Petitioners also rely on respondent's prior pronouncements, i.e., revenue rulings and procedures, to support their position. Petitioners claim that respondent's position in this case is inconsistent with his prior rulings, whereas petitioners' position is consistent with those prior pronouncements. Accordingly, petitioners contend that the consistent and uniform implementation of the Internal Revenue Code requires acceptance of their position.

Respondent has consistently stated that, in determining continuity of interest, he will consider those stock dispositions occurring prior and subsequent to the merger which are "part of the plan of reorganization" (see Rev. Proc. 77–37, 1977–2 C.B. 568, 569), or are pursuant to a prearranged or preconceived plan (see Rev. Rul. 77–479, 1977–2 C.B. 119); Rev. Rul. 66–23, 1966–1 C.B. 67. These pronouncements express nothing more than a warning that the step transaction doctrine might be applicable to any disposition occurring prior to, or subsequent to, the merger. These pronouncements are broad enough to leave the door open for respondent also to argue that a given set of facts does not constitute a preconceived plan or arrangement and we see no reason to close that door in respondent's face.

August 30, 1946, petitioners sold all their preferred shares in Precision, except the 10,000 then held in escrow.

On close analysis, we find the *Heintz* case is distinguishable from the present case and, in fact, supports the result reached herein. The taxpayers in *Heintz* not only intended to sell their preferred stock, but they also committed themselves to sell. The purchasing group promised the taxpayers that their stock *would* be sold in a public offering to occur in 30 days. Consequently, the taxpayers viewed their stock simply as a deferred payment. In our view, a promise that stock will be sold leaves no room for discretion. This is unlike obtaining piggyback rights which merely permit the holder to join in a registration at his discretion. Furthermore, the mandatory or contractual nature of the sale in *Heintz* is reflected in the role played by the purchasing group in the eventual sale of the preferred stock. It is doubtful that the purchasing group would have been as involved in arranging for the private sales if such sales were not part of its agreement with the taxpayer.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*