McDONALD'S RESTAURANTS OF ILLINOIS, INC., et al., Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 81–2933.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1982.

Decided Sept. 14, 1982.

Sheldon I. Fink, Chicago, Ill., for petitioners-appellants.

Ernest J. Brown, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and GRANT,* Senior District Judge.

CUMMINGS, Chief Judge.

This income tax case is an appeal by taxpayers from 27 decisions of the Tax Court determining deficiencies in their federal income tax totaling $566,403. The Tax Court disposed of the various deficiencies in one opinion reported in 76 T.C. 972 (1981).

The pertinent facts as found by the Tax Court and supplemented by the record are not in dispute. In June 1977, when they filed their petitions in the Tax Court to review the deficiency assessments, taxpayers were 27 wholly-owned subsidiaries of McDonald's Corporation (McDonald's), the Delaware corporation that franchises and operates fast-food restaurants.[1] The taxpayers all had their principal places of business in Oak Brook, Illinois. They maintained their books and records on the accrual method and filed their tax returns on a calendar-year basis.

On the opposite end of the transaction at issue here were Melvin Garb, Harold Stern and Lewis Imerman (known collectively as the Garb-Stern group). The group had begun with a single McDonald's franchise in Saginaw, Michigan, in the late 1950's and expanded its holdings to include McDonald's restaurants elsewhere in Michigan and in Oklahoma, Wisconsin, Nevada and California. After 1968 relations between the Garb-Stern group and McDonald's deteriorated. In 1971 McDonald's considered buying some of the group's restaurants in Oklahoma, but abandoned the idea when it became clear that the acquisition could not be treated as a "pooling of interests" for accounting purposes[2] unless all of the Garb-Stern group's restaurants were acquired simultaneously. In November 1972, however, negotiations resumed, McDonald's having decided that total acquisition was necessary to eliminate the Garb-Stern group's friction.

The sticking point in the negotiations was that the Garb-Stern group wanted cash for its operations, while McDonald's wanted to acquire the Garb-Stern group's holdings for stock, consistent with its earlier expressed preference for treating the transaction as a "pooling of interests" for accounting purposes. McDonald's proposed a plan to satisfy both sides: it would acquire the Garb-Stern companies for McDonald's common stock, but it would include the common stock in a planned June 1973 registration so

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. Since the Tax Court's decisions, the 27 subsidiaries have merged into five larger subsidiaries, whose names have been substituted in this appeal.

2. The Tax Court's opinion describes "pooling of interests" as follows:

   The pooling of interests method accounts for a business combination as the uniting of the ownership interests of two or more companies by exchange of equity securities. No acquisition is recognized because the combi-

nation is accomplished without disbursing resources of the constituents. Ownership interests continue and the former bases of accounting are retained. The recorded assets and liabilities of the constituents are carried forward to the combined corporation at their recorded amounts. Income of the combined corporation includes income of the constituents for the entire fiscal period in which the combination occurs. The reported income of the constituents for prior periods is combined and restated as income of the combined corporation.

76 T.C. at 976, n. 4. See also note 6 *infra*.

that the Garb-Stern group could sell it promptly.[3]

Final agreement was not reached until March 1973. Negotiations then were hectic; for a variety of accounting and securities-law reasons, the acquisition had to be consummated not before and not after April 1, 1973. The final deal was substantially what had been proposed earlier. The Garb-Stern companies would be merged in stages into McDonald's,[4] which would in turn transfer the restaurant assets to the 27 subsidiaries that are the taxpayers here. In return the Garb-Stern group would receive 361,235 shares of unregistered common stock. The agreement provided that the Garb-Stern group could participate in McDonald's planned June 1973 registration and underwriting or in any other registration and underwriting McDonald's might undertake within six years (Art. 7.4); the group also had a one-time right to demand registration in the event that McDonald's did not seek registration within the first year (Art. 7.5).[5] The Garb-Stern group was not obligated by contract to sell its McDonald's stock but fully intended to do so.

After the April 1 closing, both parties proceeded on the assumption that the Garb-Stern group's shares would be included in the June 1973 "piggyback" registration. In mid-June a widely publicized negative report about McDonald's stock caused the price to drop from $60 to $52 a share in two weeks, and McDonald's therefore decided to postpone the registration and sale of additional stock. The Garb-Stern group acquiesced, although it had made no effort to withdraw from the registration before McDonald's decided to cancel it.

Through the rest of the summer, the price of McDonald's stock staged a recovery. In late August McDonald's decided to proceed with the registration, and the Garb-Stern group asked to have its shares included. The registration was announced on September 17 and completed on October 3, 1973. The Garb-Stern group thereupon sold virtually all of the stock it had acquired in the transaction at a price of more than $71 per share.

In its financial statements McDonald's treated the transaction as a "pooling of interests". In its tax returns for 1973, however, it treated it as a purchase.[6] Consistent with that characterization, McDonald's gave itself a stepped-up basis in the assets acquired from the Garb-Stern group to reflect their cost ($29,029,000, representing the value of the common stock transferred and a $1–2 million "nuisance premium" paid to eliminate the Garb-Stern group from the McDonald's organization). It allocated that basis among various Garb-Stern assets, then dropped the restaurant assets to the 27 taxpayer subsidiaries pursuant to Section 351 of the Internal Revenue Code governing transfers to corporations controlled by the transferor. The subsidiaries used the stepped-up basis allocable to them to compute depreciation and amortization deductions in their own 1973 tax returns.

3. The stock the Garb-Stern group received was unregistered. It could not be sold until it was registered or until the Garb-Stern group met the conditions of S.E.C. Rule 144 (2-year holding period and limitation on number of shares sold within a 6-month period thereafter). 76 T.C. at 982 and n.17. Sale rather than retention was attractive to the Garb-Stern group, because McDonald's stock had paid no cash dividends from 1968 to the time of this transaction. *Id.* at 985, n. 18.

4. The exact sequence of transactions by which the Garb-Stern group's companies merged into McDonald's is not important for our purposes; the merger was orchestrated so that it would ultimately be a statutory merger under Delaware corporation law.

5. The relevant parts of the agreements are quoted extensively in 76 T.C. at 983–984.

6. The Commissioner's brief makes much of the differences between the accounting and the tax treatment (Br. 9, 20), characterizing McDonald's strategies as "disingenuous" and "bordering on the duplicitous." The short answer to this argument is found in McDonald's Reply Br. at 9–10: such variations are common and accepted. The service has a special form (Schedule M) for corporations to file in order to reconcile their financial and tax records. McDonald's duly filed such a form. Suppl.App.G.

It is those deductions by the subsidiary taxpayers that the Commissioner reduced. He ruled that the transfer of the Garb-Stern group's assets to McDonald's was not a taxable acquisition but a statutory merger or consolidation under Section 368(a)(1)(A) of the Code,[7] and that under Section 362(b) [8] McDonald's was required to assume the Garb-Stern group's basis in the assets acquired. In turn, the subsidiaries were required to compute depreciation and amortization deductions on this lower, carryover basis. With properly computed deductions, the subsidiary taxpayers owed an additional $566,403 in 1973 income taxes. The Tax Court upheld the Commissioner's deficiency assessments, and this appeal is the result.[9]

The Code distinguishes between taxable acquisitions and nontaxable (or more accurately tax-deferrable) acquisitive reorganizations under Sections 368(a)(1)(A)–(C) and 354(a)(1) [10] for the following common-sense reason: If acquired shareholders exchange stock in the acquired company for stock in the acquiring company, they have simply readjusted the form of their equity holdings. They have continued an investment rather than liquidating one, and the response of the tax system is to adjust their basis to reflect the transaction but postpone tax liability until they have more tangible gain or loss.

■ To ensure that the tax treatment of acquisitive reorganizations corresponds to the rationale that justifies it, the courts have engrafted a "continuity of interest" requirement onto the Code's provisions. See, *e.g.*, *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775; *LeTulle v. Scofield*, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355. That test examines the acquired shareholders' proprietary interest before and after the reorganization to see if "the acquired shareholders' investment remains sufficiently 'at risk' after the merger to justify the nonrecognition tax treatment," 76 T.C. at 997.

The taxpayers, the Commissioner, and the Tax Court all agree that the Garb-Stern group holdings were acquired by statutory merger. They also all agree that the "continuity of interest" test is determinative of the tax treatment of the transaction of which the statutory merger was a part. But the taxpayers on the one hand, and the Commissioner and the Tax Court on the other, part company over how the test is to be applied, and what result it should have produced. In affirming the Commissioner, the Tax Court recognized that the Garb-Stern group had a settled and firm determination to sell their McDonald's shares at the first possible opportunity rather than continue as investors, 76 T.C. at 989. It nonetheless concluded that because the Garb-Stern group was not contractually bound to sell, the merger and the sale could be treated as entirely separate transactions and the

7. Section 368(a)(1)(A), dealing with definitions relating to corporate reorganizations, provides partially as follows:

   (a) *Reorganization.*—

     (1) *In general.*—For purposes of parts I [distributions by corporations] and II [corporate liquidations] and this part [corporate organizations and reorganizations], the term "reorganization" means—

     (A) a statutory merger or consolidation * * *.

8. Section 362(b), dealing with basis to corporations, provides:

   (b) *Transfers to Corporations.*—If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsec-

tion shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the exchange of stock or securities of the transferee (or of a corporation which is in control of the transferee) as the consideration in whole or in part for the transfer.

9. The Tax Court denied taxpayers' motion for reconsideration about 3 months before they filed their notice of appeal.

10. Section 354(a)(1) provides:

   No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

**524**

continuity-of-interest test applied in the narrow time-frame of the April transaction only. Thus tested, the transaction was in Judge Hall's view a nontaxable reorganization, and the taxpayer subsidiaries were therefore saddled with the Garb-Stern group's basis in taking depreciation and amortization deductions. The taxpayers by contrast argue that the step-transaction doctrine should have been applied to treat the April merger and stock transfer and the October sale as one taxable transaction. They also argue that the Tax Court's extremely narrow view of both the step-transaction doctrine and the continuity-of-interest test in this case is not consonant with appellate court case law, the Tax Court's own precedents, or the Service's practices hitherto. We agree with the taxpayers.

*The Step-Transaction Doctrine*

▮▮▮ The step-transaction doctrine is a particular manifestation of the more general tax law principle that purely formal distinctions cannot obscure the substance of a transaction. See *e.g., Redding v. Commissioner,* 630 F.2d 1169, 1175 (7th Cir. 1980), certiorari denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 338. As our Court there noted:

The commentators have attempted to synthesize from judicial decisions several tests to determine whether the step transaction doctrine is applicable to a particular set of circumstances * * *. Unfortunately, these tests are notably abstruse—even for such an abstruse field as tax law.

Nonetheless, under any of the tests devised—including the intermediate one nominally adopted by the Tax Court and the most restrictive one actually applied in its decision—the transactions here would be stepped together. For example, under the "end result test," "purportedly separate transactions will be amalgamated with a single transaction when it appears that they were really component parts of a single

transaction intended from the outset to be taken for the purpose of reaching the ultimate result." 76 T.C. at 994, citing *King Enterprises, Inc. v. United States,* 418 F.2d 511, 516 (Ct.Cl.1969) and referring to *Redding, supra,* 630 F.2d at 1175. Here there can be little doubt that all the steps were taken to cash out the Garb-Stern group, although McDonald's sought to do so in a way that would enable it to use certain accounting procedures.[11] Admittedly, not every transaction would be as pellucid as this one, but here the history of the parties' relationships, the abortive attempt to buy some of the group's holdings, the final comprehensive deal, and the Garb-Stern group's determination to sell out even in the face of falling prices in the stock[12] all are consistent and probative.

A second test is the "interdependence" test, which focuses on whether "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." *Redding, supra,* at 1177, quoting with approval Paul, *Selected Studies in Federal Taxation* (2d Series 1938) 200, 254. This is the test the Tax Court purported to apply, 76 T.C. at 997–999, although its version of the test is indistinguishable from yet another formulation, the "binding commitment" test. That is, the Tax Court would have found interdependence only if the Garb-Stern group had itself been legally bound to sell its stock. In fact, the "interdependence" test is more practical and less legalistic than that. It concentrates on the relationship between the steps, rather than on the "end result" (cf. p. 524, *supra*). Here it would ask whether the merger would have taken place without the guarantees of saleability, and the answer is certainly no. The Garb-Stern group's insistence on this point is demonstrated both by its historic stance in these negotiations and by the hammered-out terms of the agreement. Although the Tax Court emphasized

11. See notes 2 and 6 *supra.*

12. As indicated by their participation in the proposed "piggyback" registration scheduled

for June 1973. The decision to postpone registration because of adverse publicity and a fall in the price of McDonald's shares was entirely McDonald's. See p. 522 *supra.*

the permissive terms about "piggyback" registration, it glossed over the Garb-Stern group's one-time right to force registration—and hence sale—under the agreement. The very detail of the provisions about how McDonald's would ensure free transferability of the Garb-Stern group's McDonald's stock shows that they were the *quid pro quo* of the merger agreement.

Finally the "binding commitment" test most restricts the application of the step-transaction doctrine, and is the test the Tax Court actually applied, despite its statements otherwise. The "binding commitment" test forbids use of the step-transaction doctrine unless "if one transaction is to be characterized as a 'first step' there [is] a binding commitment to take the later steps." *Redding, supra,* at 1178, quoting *Commissioner v. Gordon,* 391 U.S. 83, 96, 88 S.Ct. 1517, 1524, 20 L.Ed.2d 448. The Tax Court found the test unsatisfied because the Garb-Stern group was not legally obliged to sell its McDonald's stock. We think it misconceived the purpose of the test and misapplied it to the facts of this case.

In the first place, the "binding commitment" test is the most rigorous limitation on the step-transaction doctrine because it was formulated to deal with the characterization of a transaction that in fact spanned several tax years and could have remained "not only indeterminable but unfixed for an indefinite and unlimited period in the future, awaiting events that might or might not happen." *Gordon, supra,* 391 U.S. at 96, 88 S.Ct. at 1524. By contrast this transaction was complete in six months and fell entirely within a single tax year. The degree of uncertainty that worried the *Gordon* court is absent here, and a strong antidote for uncertainty is accordingly not needed.

In the second place, the Tax Court underestimated the extent to which the parties were bound to take the later steps. The registration and underwriting provisions in the parties' agreement did not just enhance salability; they were essential to it. Unless and until McDonald's registered the stock, it was essentially untransferable. 76 T.C. at 981–982; see note 3 *supra.* Second, although McDonald's had the choice of when during the first year after the merger it would seek registration, if it did nothing the Garb-Stern group could make a legally enforceable demand for registration in either year two or year three. On the other hand, if McDonald's did register stock during the first year but the Garb-Stern group chose not to "piggyback," the group's demand registration rights would be lost. These limitations made it extremely likely that the sale would—as it did—take place promptly. They are enough to satisfy the spirit, if not the letter, of the "binding commitment" test.

Under any of the three applicable criteria, then, the merger and subsequent sale should have been stepped together. Substance over form is the key (*Kuper v. Commissioner,* 533 F.2d 152, 155 (5th Cir. 1976)). Had the Tax Court taken a pragmatic view of the actions of the Garb-Stern group, it would have found that they clearly failed to satisfy the continuity-of-interest requirement that has been engrafted onto the Code provisions governing nonrecognition treatment for acquisitive reorganizations.

*Statutory Merger Precedents*

Quite apart from the proper application of the step-transaction doctrine, the available precedents dealing with statutory mergers and the effect of post-merger sales by acquired shareholders—though scanty—strongly support the taxpayers. No case supports the myopic position adopted below that although "the crux of the continuity-of-interest test lies in the *continuation* of the acquired shareholders' proprietary interest" (76 T.C. at 997), the test "by itself does not require *any length* of postmerger retention," (*id.*) (emphasis supplied).

The taxpayers rely on, and the Tax Court was unsuccessful in distinguishing, *Heintz v. Commissioner,* 25 T.C. 132 (1955). The *Heintz* case differs from this case only in focusing on the tax liability of the acquired shareholders rather than the acquiring corporation. The facts of the case, somewhat simplified, are as follows.

Heintz and Jack (taxpayers) formed a company (Jack & Heintz, Inc.) to manufacture arms and ammunition during World War II. At the war's end, they determined to sell it rather than try to reorganize its production for peacetime. The buyer was the Precision Corporation, which had been formed to acquire Jack & Heintz. On March 5, 1946, Precision acquired almost all the outstanding shares of Jack & Heintz from the taxpayers for $5 million cash and 50,000 preferred shares of Precision, with a par value of $50 each. On March 6 Precision merged its newly acquired subsidiary with itself. At the time the deal was being negotiated, two of the parties representing the buyer assured the taxpayers that the Precision shares they had received as part payment would be sold in a public offering planned for thirty days after the merger (25 T.C. at 135), but this promise was nowhere reflected in the thirty-five page written agreement covering the whole transaction (*id.* at 137). Owing to unforeseen delays, the contemplated registration and sale did not take place, but the buyers helped arrange a private sale at $30 per share in August 1946. In their 1946 returns, the taxpayers reported long-term capital gain computed on a figure arrived at by deducting from the sale proceeds ($5 million in cash + $2,500,000 worth of Precision stock) their $112,000 basis in the Jack & Heintz stock. They also reported short-term capital losses of $1 million on the August private sale of the Precision stock.

The Commissioner assessed deficiencies, using exactly the reasoning the Tax Court has adopted in McDonald's case. He treated the transaction as a statutory reorganization, which had no immediate tax consequences (except that the cash component of the price was ordinary income). He then

gave the taxpayers a carry-over basis of $112,000, rather than a cost basis, in the Precision stock. Finally he treated the August sale as producing sizable capital gains ($1,500,000 less $112,000) rather than capital losses. Although the Commissioner's position is sketchily presented in the Tax Court's opinion, his treatment must have involved a conviction that neither the promise to sell the Precision stock nor the actual sale changed the character of the reorganization.

The Tax Court rejected the Commissioner's position unequivocally.[13] Although a statutory merger had occurred,

> [e]ssential to this arrangement was the promise made to petitioners by members of the purchasing group that the preferred stock * * * would shortly thereafter be sold on their behalf * * *.

> \*    \*    \*    \*    \*    \*

> The term "reorganization as used in [the predecessor of Section 354(a)(1) ], contemplates a readjustment of the corporate structure of an enterprise and requires that those individuals who are owners of the enterprise prior to such readjustment continue to maintain a substantial proprietary interest therein. * * * The terms of the instant plan did not contemplate the petitioners' maintenance of a proprietary interest in the continuing operation. * * * [P]etitioners wished to dispose of their entire interest in Jack & Heintz, Inc. * * * [T]hey settled for cash plus preferred stock * * * only after obtaining the promise of the promoters of [the] purchasing corporation that their preferred stock in that corporation would be sold together with a public offering of that corporation's stock within 30 days." 25 T.C. 142–143.[14]

---

**13.** At oral argument counsel for the Commissioner argued that both the Tax Court and the author of the Commissioner's brief in the *McDonald's* case had misconstrued the *Heintz* case. He advocated treating it as first, last, and always a sale (*on* March 5, 1946). The March 6, 1946, merger was, he maintained, entirely irrelevant. That was in fact the taxpayers' position in *Heintz*, 25 T.C. at 141, but the Tax Court gives no hint of having accepted it. We sus-

pect that the Tax Court was rightly unwilling to separate transactions that occurred within 24 hours of each other.

**14.** The Treasury Regulation on which the *Heintz* Court relied (Section 29.112(g) 1 of Regulations 111) is identical to Section 1.368-1(b) of the current regulations (26 C.F.R. § 1.368 1(b)) (quoted in full in note 16 *infra*).

As in the present case, the taxpayers' wishes to sell were clear and the transaction was designed to accommodate them. As in the present case, the acquiring corporation's promise was to facilitate the sale, not to guarantee it. As in the present case, the acquiring corporation did not require a reciprocal commitment from the acquired shareholders—for all that appears, Heintz and Jack were free to retain their equity interest in Precision. As in the present case, these understandings of the parties were not reflected in the written agreement. There is no principled way to distinguish the two cases, and the Tax Court's efforts to do so here (76 T.C. at 1001) are unsuccessful.

The only other case we have found that involves statutory mergers and the continuity-of-interest requirement is *United States v. Adkins-Phelps, Inc.*, 400 F.2d 737 (8th Cir. 1968). The Tax Court here noted the case's existence, 76 T.C. at 996, n. 39, but placed only oblique reliance on it, *id.* at 996–997 and n. 42. The relevant Government argument there was that a woman who had traded 99% of the stock of a family-owned corporation for a 16% interest in Adkins-Phelps did not exhibit the requisite continuity of interest because Adkins-Phelps had a right of first refusal on all her shares, exercisable (and indeed exercised) for $1 a share. 400 F.2d at 741. The Government did not try to treat the exercise as a sale, but argued that no real equity rights were ever conveyed because of the first-refusal

limitation. *Id.* That argument has no application here. Both the district court and the Court of Appeals rejected the Government's position. *Id.* at 739, 741.

Given the dearth of precedent and the aptness of the Tax Court's reasoning in *Heintz*, we think that .case dictates a consistent—and favorable—treatment of the taxpayers in this appeal.

*Additional Considerations*

Part of the reason that there is so little litigation about statutory mergers and the effect of post-merger events on tax treatment is that people involved in nontaxable reorganizations usually seek advice in the form of private letter rulings beforehand. See McDonald Br. 25–27; cf. also Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* (4th ed. 1979) ¶ 14.01 at 14–7–8 ("Rarely do the participants deliberately invite a test of strength in the courts, even if they feel a good deal of confidence in the outcome. As a result, the Service can make 'law' in this area by a lifted eyebrow.").[15]

The Commissioner's usual position in this context is not the one adopted by the Tax Court, namely, that the intent of the acquired shareholders is irrelevant and no period of post-merger retention is required. 76 T.C. at 990, 992, 997. See, for example, Rev.Proc. 77–37, 1977–2 C.B. 568, 569:

The "continuity of interest" requirement of section 1.368–1(b) of the Income Tax Regulations [16] is satisfied if there is a

---

15. This general understanding suggests—although it is far from probative—that the parties here would also have sought the Internal Revenue Service's imprimatur if they had intended to effect a nontaxable reorganization.

16. This Regulation provides:

§ 1.368 1. Purpose and scope of reorganization exchanges.

\* \* \* \* \* \*

(b) Purpose. Under the general rule, upon the exchange of property, gain or loss must be accounted for if the new property differs in a material particular, either in kind or in extent, from the old property. The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures

made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. Requisite to a reorganization under the Code are a continuity of the business enterprise under the modified corporate form, and (except as provided in section 368(a)(1)(D)) a continuity of interest therein on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization. The Code recognizes as a reorganization the amalgamation (occurring in a specified way) of two corporate enterprises under a single corporate structure if there exists among the holders of the stock and securities of either of the old corporations the requisite continuity of interest in the new corporation, but

*continuing* interest through stock ownership in the acquiring or transferee corporation (or a corporation in "control" thereof within the meaning of section 368(c) of the Code) on the part of the former shareholders of the acquired or transferor corporation which is equal in value, as of the effective date of the reorganization, to at least 50 percent of the value of all of the formerly outstanding stock of the acquired or transferor corporation as of the same date. . . . *Sales, redemptions, and other dispositions of stock occurring prior or subsequent to the exchange which are part of the plan of reorganization will be considered in determining whether there is a 50 percent continuing interest through stock ownership as of the effective date of the reorganization.* (Emphasis added.)

Cf. Rev.Proc. 74 26, 1974–2 C.B. 478; Rev. Proc. 66–34, 1966–2 C.B. 1232. Moreover, the Commissioner usually does not limit his scrutiny to explicit, contemporaneous commitments to sell out, Rev.Rul. 77–479, 1977–2 C.B. 119; Rev.Rul. 66–23, 1966–1 C.B. 67. In fact, taxpayers who seek a ruling in advance of a reorganization must represent that there is "no plan *or intention* on the part of the Acquired shareholders to [reduce their new holdings] to a number of shares having, in the aggregate, a value of less than 50 percent of the total value of the Acquired stock outstanding immediately prior to the proposed transaction." McDonald Br. 25; Appendix, Tab B, pp. 3–5 (emphasis added).

Against this background, the Commissioner's treatment of the McDonald's transaction—as affirmed by the Tax Court— seems opportunistic. The agency's practice, described above, suggests that if McDonald's had laid its plan before the Internal Revenue Service ahead of time, it would not have been deemed a nontaxable reorganization. Furthermore the Garb-Stern group has already been fully taxed because of its relatively prompt disposition; the Internal Revenue Service has had all the benefits of sale treatment on that end of the transaction. See Prusiecki, *"Continuity of Interest in Tax-free Mergers: New Opportunities After McDonald's of Zion,"* 55 J.Tax. 378, 380 (1981). Now the Service seeks to saddle the taxpayers with the disadvantageously low basis that goes with the "reorganization" label. On the other hand, as the taxpayers note (Reply Br. 14), if the Garb-Stern group's basis had been higher than the fair market price of the McDonald's shares exchanged, the Commissioner could, consistently with his prior positions, have refused reorganization status and forced the taxpayers to accept a lower, cost basis for depreciation and amortization purposes. This is heads-I-win, tails-you-lose law.

If, on the other hand, the treatment here represents a considered change in the Service's treatment of reorganizations, then the Commission's victory in the Tax Court was Pyrrhic and he should welcome reversal. The Tax Court's decision was barely six months old before tax planners were publicizing the possibilities for manipulating it. Prusiecki, *op. cit.,* at 380–381, notes nine new types of tax avoidance that the case opens up, all taking advantage of the new found ability to obtain reorganization status without constraining post-merger sales. The key to all of them is the extraordinary rigidity of the "binding commitment" test and the ephemeral continuity of interest the Tax Court seems to require.

The decisions appealed from are reversed, with instructions to enter fresh decisions in the taxpayers' favor.

---

there is not a reorganization if the holders of the stock and securities of the old corporation are merely the holders of short-term notes in the new corporation. In order to exclude transactions not intended to be included, the specifications of the reorganization provisions of the law are precise. Both the terms of the specifications and their underlying assumptions and purposes must be satisfied in order to entitle the taxpayer to the benefit of the exception from the general rule. Accordingly, under the Code, a short-term purchase money note is not a security of a party to a reorganization, an ordinary dividend is to be treated as an ordinary dividend, and a sale is nevertheless to be treated as a sale even though the mechanics of a reorganization have been set up. 26 CFR § 1.368 1(b).