MAURICE M. WEIKEL AND LORRAINE H. WEIKEL. Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weikel v. Commissioner
Docket No. 17990-81.
United States Tax Court
T.C. Memo 1986-58; 1986 Tax Ct. Memo LEXIS 548; 51 T.C.M. (CCH) 432; T.C.M. (RIA) 86058; February 10, 1986. *548 In 1967, petitioner, a dentist, acquired a patent for a dental amalgam called Dispersalloy. In September 1973, petitioner formed a corporation, Dispersalloy, Inc., and transferred his patent to it in exchange for all its stock. In January 1974, petitioner and Johnson & Johnson executed an agreement and Plan of Reorganization of the Dispersalloy Corporation under which petitioner transferred all of his stock in Dispersalloy, Inc. to Johnson & Johnson in exchange for Johnson & Johnson stock. Held: Dispersalloy, Inc. was organized for a substantial business purpose. Held, Further: The exchange of Dispersalloy, Inc. stock by petitioner for stock of Johnson & Johnson qualifies as a tax-free reorganization under sections 354(a)(1) and 368(a)(1)(B), I.R.C.
Held, Further: The step-transaction doctrine does not apply to make the transaction taxable. West Coast Marketing Corp. v. Commissioner,46 T.C. 32 (1966), distinguished. Laurence L. Pillsbury, for the petitioners. Karen Nicholson Sommers, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' Federal income tax in the amount of $1,750,273 for the taxable *549 year 1974. The issue remaining for our decision [1] is whether petitioners' transfer of stock from Disperalloy, Inc. for stock in Johnson & Johnson qualifies as a tax-free reorganization under sections 354(a)(1)[2] and 368(a)(1)(B). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and joint exhibits are incorporated herein by this reference. Maurice M. and Lorraine H. Weikel (petitioners) [3] are husband and wife who were legal residents of Las Vegas, Nevada, at the time they filed their petition in this case. They filed a joint Federal income *550 tax return for 1974 [4] with the Internal Revenue Service Center in Ogden, Utah. On January 25, 1980, the parties executed an agreement extending the statute of limitations for the respondent's determination of a deficiency for the 1974 taxable year until June 30, 1981. This agreement is effective only if there is an omission from petitioners' gross income which is in excess of 25 percent of the amount of gross income reported on petitioners' 1974 return. [5] *551 Acquisition of Dispersalloy
During the years at issue petitioner was employed as a dentist. While working as a dentist, he began research on a new dental amalgam as he was disappointed in the life of his dental restorations. A dental amalgam is an alloy used in the restoration of teeth. His research subsequently led to his development of a stronger, more effective dental amalgam that he began using with some of his patients. He sought a patent for the alloy only to find out that a patent had already been applied for. The patent had been purchased from its owner by Western Metallurgical Ltd. (Western). Petitioner obtained a licensing agreement from Western on October 19, 1967, which gave him the exclusive right to manufacture, market and sell the alloy in the U.S. under the trade name of "Dispersalloy." Later on November 15, 1967, this agreement was expanded to include North, South, and Central America, but not Canada. [6] The agreement with Western did not require petitioner to make a cash payment; however he was to make royalty payments to Western based upon the amount of Dispersalloy used and sold. *552 The agreement did not allow petitioner to transfer his rights to manufacture and market Dispersalloy without first obtaining Western's consent. Petitioner did not market Dispersalloy extensively when he first acquired the patent rights. At first he just used the alloy with his own patients. In March of 1970, petitioner asked his attorney, Robert Lesh (Lesh), to file articles of incorporation for a company called American Silver and Mercury Producers (ASMP). Lesh advised petitioner to consult Philip Altfest (Altfest) about the tax aspects of incorporating and running a corporation. Altfest was an attorney with a background in accounting who specialized in corporate taxation. ASMP was established as a cash basis taxpayer. Its articles were filed on March 3, 1970, in the state of California.ASMP's articles stated *553 that its purpose was to "engage primarily in the specific business of manufacturing of dental alloys and mercury." On March 31, 1970, ASMP's directors adopted bylaws, elected officers, and authorized the issuance to petitioners of ten shares of common stock for a consideration of $10. However, no assets were ever transferred to ASMP, nor did it ever conduct any business. ASMP's corporate charter was suspended on April 2, 1973 for nonpayment of California franchise taxes. Petitioner stated that he did not activate ASMP because the manufacture of Dispersalloy did not produce immediate profits as he had anticipated. Manufacturing the alloy proved costly, generating substantial losses. Petitioner chose instead to continue his operation as a sole proprietor, rather than as a corporation so that he, individually, could benefit from the losses incurred. [7]
Petitioner *554 wanted to expand his manufacture of Dispersalloy. At a dental convention prior to 1973, he discussed Dispersalloy with a classmate of his who then contacted Unitek Corporation (Unitek). Unitek and petitioner reached an agreement whereby petitioner would manufacture the alloy and Unitek would market it. Shortly thereafter, petitioner leased a manufacturing plant in El Cajon, California. Unitek encountered problems in marketing the alloy and was unable to purchase from petitioner the volume to which they had agreed. Hence, petitioner voided his agreement with Unitek and began to market Dispersalloy on his own sometime in August of 1973. Sales of Dispersalloy increased in 1973 after the publication of several research papers that discussed it favorably. Negotiations with J&J
In April of 1973 petitioner was approached by Dr. Martin Stein (Stein), vice president in charge of business development for the Dental Products Division of Johnson & Johnson (J&J). J&J was a New Jersey corporation engaged in the manufacture and marketing of various dental care products whose stock was listed on the New York Stock Exchange. [8] J&J had learned about Dispersalloy at a dental convention earlier *555 in April where they had also met Bruce Ady, one of petitioner's employees, and expressed a desire to learn more about the alloy. Stein met again with petitioner on April 25, 1973, to discuss the possibility of an arrangement with petitioner that would allow J&J to market Dispersalloy. In May 1973 petitioner visited the J&J manufacturing plant in New Jersey. On June 1, 1973, Stein wrote to petitioner requesting additional information about ASMP. This information was supplied to Stein on June 15, 1973. Sometime in late July of 1973 petitioner learned that Pennwalt Corporation, an organization that manufactured and distributed dental products through its S.S. White Division, claimed that it held some patent rights to a product that was the subject matter of a paper entitled "Dispersion Hardening *556 of Amalgams" by W. V. Youdelis and D. B. K. Innes given at a meeting in St. Louis of the International Association for Dental Research in March of 1962. W. V. Youdelis was the inventor and original patentee of Dispersalloy. This prompted S.S. White to claim that petitioner's patent was invalid. Petitioner discussed this problem with J&J's patent attorney who indicated that it was possible that there was a problem with petitioner's patent. As sales of Dispersalloy increased, petitioner decided that it was time to revitalize ASMP. He met with Altfest in August of 1973 to discuss the tax benefits of marketing Dispersalloy through a corporation. At that time petitioner had been contacted by J&J but no real negotiations had taken place. Altfest prepared a memorandum for a negotiation session to be held between petitioner and J&J on August 9, 1973, in San Diego (San Diego meeting). At the San Diego meeting, petitioner decided, at J&J's suggestion, to incorporate under the name of "Dispersalloy, Inc." instead of revitalizing ASMP. This decision was made because it was felt that Dispersalloy was a well-known name and would be more effective for marketing purposes than would revitalizing *557 ASMP. [9]
Discussions at the San Diego meeting centered around a joint venture proposal by petitioner whereby petitioner would incorporate and manufacture Dispersalloy while J&J would have the sole right to market Dispersalloy. J&J would receive an option to buy all of the Dispersalloy, Inc. stock after three years. J&J was also to make a loan to Dispersalloy, Inc. [10]
A second meeting was held between representatives from J&J and petitioner on August 22, 1973, in New Jersey (New Jersey meeting). At this meeting the J&J representatives rejected the joint venture arrangement proposed by petitioner and suggested instead that the transaction be structured as a pooling of interests. [11] *560 J&J told petitioner that they wanted him to incorporate Dispersalloy to help effectuate this pooling of interests. J&J would then exchange its stock for stock of Dispersalloy, Inc. The parties *558 discussed a base price for Dispersalloy, Inc. of $3.5 million [12] plus an additional sum for Dispersalloy, Inc.'s assets. Royalties were also discussed with a figure of around $500,000 being considered but the length of prepayment was not settled. A problem was encountered in the negotiations due to the uncertainty concerning the validity of petitioner's patent. J&J refused to close the transaction until an agreement was obtained from the owner of the patent in Canada. However, J&J stated that they would purchase Dispersalloy regardless of the patent's validity with the understanding that the amount of royalties petitioner would receive would depend upon whether J&J was the only one allowed to market Dispersalloy. Also considered at the New Jersey meeting was whether the transaction would be effective as a tax-free reorganization if it was structured according to J&J's demands. Altfest and petitioner originally thought that the exchange of J&J stock for stock of Dispersalloy, Inc. might produce a taxable capital gain to petitioner. Petitioner therefore requested that J&J assist him in a private placement for some of the stock that he was receiving in the exchange. In this way *559 petitioner would be able to pay the capital gains tax incurred on the transaction by selling some of the J&J stock shortly after the exchange occurred. [13] Throughout the negotiations both parties were aware that any agreement that was reached was subject to the approval of J&J's Board of Directors, and that a final definitive agreement would have to be drawn up and signed by both parties before anyone was legally bound. In addition, a final condition to J&J's purchase of Dispersalloy was the receipt by J&J of a favorable accounting opinion concerning the pooling of interests. Throughout the negotiations petitioner was concerned about agreeing to let J&J market Dispersalloy. He was concerned about whether J&J would try to improve the quality of Disperalloy, or would produce it as a poorer alloy in order to save money. He was also concerned that he was not receiving sufficient royalties and that J&J was lying to him about the sufficiency of his patent. While negotiations continued with J&J, petitioner contacted several other companies including 3M, Unitek, Columbus Dental, Warner Lambert, and L. D. Cock with regard to the manufacturing and marketing of Dispersalloy. Prior to the time he was contacted by J&J, petitioner had not thought seriously about selling his interest in Dispersalloy. After he met with J&J he decided that Dispersalloy *561 would be more successful if it were marketed by someone with more money and more experience in such matters. After the New Jersey meeting, Altfest advised petitioner that he should incorporate Dispersalloy whether or not the transaction with J&J was finalized. He stated that based upon the negotiations with J&J it was clear to him that whoever purchased Dispersalloy would be interested in a pooling of interests which required that Dispersalloy be incorporated. In addition, Altfest advised petitioner that since he had begun to make a profit in manufacturing Dispersalloy it would now be advantageous to incorporate. On September 13, 1973, articles of incorporation were filed with the State of California for Dispersalloy, Inc. [14]The corporation's purpose as stated in its articles was to "engage primarily in the specific business of manufacturing of dental alloys and mercury." On October 10, 1973, the Board of Directors of Dispersalloy, Inc. adopted bylaws, elected officers, and authorized the issuance of stock. However, because petitioners' books and records were in poor condition, it was not until November 2, 1973, that petitioner transferred his Dispersalloy assets to Dispersalloy, *562 Inc. and it assumed all of his obligations and liabilities related to that business. The patent rights to Dispersalloy, with a zero cost basis, were included in the transfer. [15]Altfest wanted Dispersalloy to be an accrual basis taxpayer with its taxable year ending either October 31, or November 30 for business purposes. [16] Dispersalloy, Inc. did not adopt a pension or profit-sharing plan but it did have a health insurance plan. On or about *563 October 10, 1973, Altfest was contacted by J&J's representatives who stated that J&J could not agree to pay royalties to petitioner because it would interfere with their plan to have a pooling of interests. Negotiations continued on this point and resulted in J&J agreeing to pay petitioner a lump sum for his license to market Dispersalloy instead of paying him royalties over a twelve year period as originally discussed. As part of the negotiation process, J&J sent one of its employees into petitioner's plant under a secrecy agreement to view the manufacture of Dispersalloy. The negotiations were prolonged, prompting Altfest to send a letter to J&J stating that if a definitive agreement were not reached with petitioner by October 12, 1973, then the J&J employee would have to leave petitioner's plant. On October 4, 1973, J&J responded to this letter by sending petitioner a document described as a "boilerplate reorganization agreement" used by J&J in stock-for-stock transactions. J&J advised petitioner to review the document in order to save time if an agreement was soon reached on the material terms of the transaction. J&J representatives next contacted petitioner at a dental convention *564 in Houston on or about October 31.At this meeting, J&J made a final proposal of a lump sum payment to replace the royalty arrangement. Petitioner accepted this offer after discussing it with Altfest. Negotiations continued on the price for Dispersalloy, Inc.'s tangible assets and its other inventory, the amount of stock that petitioner could sell after the transaction was closed to pay the tax on the transaction, and who was to pay for the cost of placing the stock. It was later decided that petitioner could sell $2.8 million of the stock he received. [17]
On November 7, 1973, J&J sent a letter to Bruce Ady (Ady), one of petitioner's employees offering him a job in the event J&J was able to reach a final agreement with Dispersalloy, Inc.Ady was in charge of research and development at Dispersalloy, Inc. Petitioner had intended to discharge Ady in early August but retained him at J&J's request. Ady was employed by J&J on December 15, 1973, and remained in their employ until the spring of 1974. On or about November *565 15, 1973, J&J appointed several individuals to handle the manufacturing and marketing of Dispersalloy, including a product director, a controller of accounting, a purchaser, and an engineer.Also in mid-December, Martin Stein (Stein), one of J&J's vice-presidents, moved to San Diego to learn about the manufacture of Dispersalloy from petitioner. Petitioner and Altfest met in early December to discuss fully the financial aspects of the entire transaction with J&J. Altfest opined that despite the close proximity of the incorporation of Dispersalloy, Inc. to the transaction between Dispersalloy, Inc. and J&J, if there was no binding agreement prior to the incorporation of Dispersalloy, Inc. to sell the stock of J&J received in the exchange, then the transaction would qualify as a tax free exchange. Petitioner then suggested that the provision in the agreement allowing petitioner to sell some of the stock through private placement be eliminated and that J&J pay petitioner the additional amount it would incur in the private placement of petitioner's stock. J&J at first disagreed with petitioner's proposal but after considerable discussion finally agreed to give petitioner additional stock *566 worth $300,000 to $400,000. This additional stock was intended to reimburse petitioner for the tax he would have to pay if he immediately sold some of the J&J stock. J&J's representatives stated that up to this point in the negotiations they viewed the transaction as taxable to petitioner. On January 18, 1974, an agreement was executed between petitioners and J&J entitled "AGREEMENT AND PLAN OF REORGANIZATION OF THE DISPERSALLOY CORPORATION." Under the agreement, petitioners were to exchange all of the stock of Dispersalloy, Inc. for an amount of J&J common stock to be determined at a later date.An amendment to this agreement was executed on March 1, 1974, which changed the agreed method of valuing inventory, work in progress, and raw materials. On March 1, 1974, the transaction was closed with petitioners delivering all of the outstanding Dispersalloy stock to J&J. J&J then delivered 48,898 shares of its unregistered voting common stock to petitioners on April 30, 1974. The parties agreed that the average of the closing prices for a share of J&J common stock on the New York Stock Exchange between March 4, 1974, and March 15, 1974, would be taken as the value of the J&J stock for *567 purposes of determining the number of shares of J&J stock to be issued to petitioner. This average price was determined to be $108.2875 per share. The shares of J&J common stock received by petitioners were not registered for distribution under the Securities Act of 1933. J&J assumed no obligation to so register the shares. Ten percent of the shares received by petitioners was placed in escrow with National Bank of New Jersey to be held for 23 months as security for petitioners' obligation to indemnify J&J from liabilities of Dispersalloy that occurred after the transaction was executed. The stock received by petitioners was valued at $4,368,058. [18] *568 This value was computed by taking the value of $108.94 per share, which was the mean trading price per share of J&J common stock on April 1, 1974, the date J&J was to deliver the stock to petitioners, and reducing this value by 18 percent to $89.33 per share, due to the restrictions on petitioners' shares. On March 1, 1974, Altfest delivered an opinion to J&J which was required as part of the parties' agreement of sale, which stated in substance that Dispersalloy, Inc. was a corporation duly organized, validly existing and in good standing under the laws of the State of California and that the authorized capital stock of Dispersalloy, Inc. consisted of 2,500 shares of common stock, 200 shares of which were outstanding and validly issued, fully paid and nonassessable. Dispersalloy, Inc. filed a U.S. Corporate Income Tax Return for a first fiscal year commencing November 1, 1973 and ending February 28, 1974. The return showed gross sales of $2,171,245, gross profit of $971,359, taxable income of $455,524, and tax of $211,844. J&J treated the transaction with petitioner as a taxable purchase of assets placing the fair market value of petitioner's assets received on its books as the value of what J&J received in the exchange. J&J also treated the patent for Dispersalloy as having a basis of around $3-3.5 million and attempted to amortize this cost over the life of the patent. This position was attacked by the IRS. J&J paid the tax determined and filed a claim for *569 refund. The IRS has continued to challenge J&J's depreciation of the patent. J&J has continued to file refund claims in response to the IRS challenges.All of these refund claims are being held in abeyance pending the disposition of this case. J&J continued to operate Dispersalloy, Inc. as a wholly owned subsidiary for two years and seven months after the agreement with petitioners was closed. Dispersalloy was produced in the plant leased by petitioner in El Cajon, California, and also in the J&J plant in New Jersey. Dispersalloy, Inc. was merged into its parent, J&J, on September 30, 1976. OPINION The issue in this case is whether petitioners' exchange of stock of Dispersalloy, Inc., for stock of J&J was a non-taxable transaction under sections 354 and 368(a)(1)(B), or whether the exchange should be "stepped together" with the incorporation of Dispersalloy and characterized as a taxable sale of Dispersalloy assets by petitioner for J&J stock pursuant to the step-transaction doctrine. The parties herein have negotiated an agreement extending the time for assessment of a deficiency beyond its typical three year period. See sec. 6501(a).This agreement is effective only if respondent *570 can prove that petitioners have omitted an amount that is in excess of 25 percent of their gross income for the taxable year 1974. See sec. 6501(e); Reis v. Commissioner,1 T.C. 9 (1942). The burden of proof is therefore on respondent to establish both that the amounts of income which were not reported were properly includible in gross income and that an amount in excess of twenty-five percent of the amount of gross income shown on the return was omitted. Easton v. Commissioner, a Memorandum Opinion of this Court dated Feb. 5, 1943.For there to be an omission herein of an amount in excess of twenty-five percent of petitioners' gross income, the transaction at issue must be taxable. Section 354 provides as a general rule that no gain or loss is to be recognized if stock or securities in a corporation which is a party to a reorganization are exchanged pursuant to a plan of reorganization for stock or securities in another corporation also a party to the reorganization. A reorganization is defined in section 368(a)(1)(B) as: the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation *571 which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition). What constitutes control for purposes of section 368(a)(1)(B) is defined in section 368(c) as: the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. On the surface this transaction qualified as a reorganization; J&J acquired all of the stock of Dispersalloy, Inc. in exchange solely for a part of its voting stock. But, stock for stock exchanges between corporations have been subjected to additional scrutiny pursuant to a judicially created doctrine called the step-transaction doctrine.Under the step-transaction doctrine an analysis is made of the separate steps of a transaction to determine whether each step should be accorded independent legal significance or whether the steps should be treated as related steps in one unified transaction, *572 and "stepped together" to produce the actual result. King Enterprises, Inc. v. United States,418 F.2d 511, 516 (Ct. Cl. 1969). This analysis is undertaken in order to determine the substantive realities of a transaction and hence its tax consequences. Gregory v. Helvering,293 U.S. 465 (1935); King Enterprises, Inc. v. United States,supra.
The step-transaction doctrine remains a somewhat elusive principle. However, there have been attempts to establish some sort of coherence as to the manner in which it is applied. Hence, courts have etablished several tests in determining whether the doctrine is applicable. However as one court noted, "these tests are notably abstruse -- even for such an abstruse field as tax law." Redding v. Commissioner,630 F.2d 1169, 1175 (7th Cir. 1980), revg. 71 T.C. 597 (1979), cert. denied 450 U.S. 913 (1981). The first test involves an examination of the intention of the parties to determine what result the parties were seeking when the transaction was undertaken. Mintz and Plumb, Step Transactions in Corporate Reorganizations, 12 N.Y.U. Institute on Federal Taxation 247, 251 (1954). This test is often called the "end result" test. King Enterprises, Inc. v. United States,supra; *573 Redding v. Commissioner,supra.Under this test, the parties' intended result would have the same tax effect regardless of the steps taken to reach the result. Mintz and Plumb, supra.
A second test has been called the "interdependence test." Mintz and Plumb, supra.This test examines the transaction to determine whether the successive steps were so interdependent that the action would have been fruitless without completing all of the steps. Mintz and Plumb, supra, quoting Paul & Zimet, Step Transactions, in Selected Studies in Federal Taxation (2d Series 200 (1938)); McDonald's Restaurants of Illinois, Inc. v. Commissioner,688 F.2d 520, 524 (7th Cir. 1982), revg. 76 T.C. 972 (1981). Finally an additional test called the "binding commitment test" is often used. This test is viewed as more restrictive than the other two and involves a determination as to whether after the first step is taken in a transaction there is a binding commitment to complete the later steps. Commissioner v. Gordon,391 U.S. 83 (1968); McDonald's Restaurants of Illinois v. Commissioner,supra at 525. One court has suggested that the binding commitment test is only applicable where a substantial period of *574 time has passed between the steps that are subject to scrutiny. Redding v. Commissioner,supra.Courts will often, in addition to the tests noted above, examine the timing of the transaction at issue. [19]
Petitioners contend that their incorporation of Dispersalloy followed by an exchange of all of the stock of Dispersalloy, Inc. for an amount of J&J stock was a tax-free "B" reorganization under sections 354 and 368(a)(1)(B). Petitioners argue that the step-transaction doctrine is inapplicable to their transaction because Dispersalloy, inc. was not a sham corporation; it was in operation conducting business for almost three years after the exchange of stock occurred. In addition, petitioners contend that the incorporation of Dispersalloy and the exchange of stock were two separate transactions since petitioners did not execute a definitive agreement for the exchange of stock until several months *575 after the incorporation of Dispersalloy, and the incorporation would not have been fruitless if the exchange of stock had not occurred. Moreover, petitioners contend that they had formulated the intent to incorporate Dispersalloy regardless of their negotiations with J&J since Dispersalloy had begun to produce a profit. In the alternative petitioners contend that even if the step-transaction doctrine is applicable any gain recognized on the exchange of stock was recognized in 1973, a year that is not before this Court, instead of 1974. Respondent contends that petitioners' transfer of his sole proprietorship assets to Dispersalloy, Inc., was one step in a prearranged integrated plan to transfer his assets to J&J in exchange for stock. Therefore respondent contends the incorporation of Dispersalloy and the exchange of stock should be stepped together to demonstrate that the transaction was in essence a purchase of petitioners' assets by J&J, not a tax-free reorganization. The question presented is a factual one; therefore a careful examination must be made of the transaction at hand. After making such an examination, we agree with petitioners. We must first determine whether the *576 incorporation of Dispersalloy was an event with independent economic substance. Respondent does not contend that the incorporation of Dispersalloy was a sham; rather, respondent argues that the incorporation lacked economic substance independent from the later exchange of stock. Respondent urges us to find that the incorporation of Dispersalloy was simply one link in a chain of steps to transfer the assets of petitioners' sole proprietorship to J&J for stock. Respondent cites West Coast Marketing Corp. v. Commissioner,46 T.C. 32 (1966), and Rev. Rul. 70-140, 1970-1 C.B. 73, as support for his contentions. In West Coast Marketing Corp., this Court held that the taxpayer formed a corporation called Manatee solely for the purpose of transferring to it the title to certain properties in exchange for Manatee's stock. An agreement for the sale of the properties to an unrelated corporation, Universal, had been detailed in a letter dated April 16, 1959. Thereafter, on April 30, 1959, Manatee was formed and received title to the properties noted. All of Manatee's stock was then transferred to Universal. Universal liquidated Manatee on December 18, 1959. While the transaction in West Coast *577 Marketing Corp. and the transaction herein do contain similarities, there are several crucial distinctions that demonstrate why the step-transaction doctrine is not applicable in petitioners' situation. In West Coast Marketing Corp. when Manatee was formed the sale of the taxpayer's properties to Universal was imminent and was in fact prearranged. Universal had made a formal offer to the taxpayer. The sale had been approved by Universal's Board of Directors.All that remained was for the taxpayer to obtain a release of the mineral rights on the properties. In contrast, in the instant case petitioners never arranged a sale of their sole proprietorship assets to J&J. The transaction was from the beginning a stock for stock exchange. This exchange was not finalized until January 18, 1974. Dispersalloy was incorporated on September 13, 1973. When Dispersalloy was incorporated, negotiations with J&J were still in progress. The parties first discussed a joing venture arrangement, then an exchange of stock with a private placement, and then a pure exchange of stock. Petitioners' agreement with J&J remained uncertain. Petitioner expressed reservations about reaching an agreement with *578 J&J because he was unsure that J&J would commit itself to impoving the amalgam Dispersalloy. Any agreement that was reached between petitioner and J&J remained tentative until it was approved by J&J's Board of Directors and J&J had received a favorable accounting opinion about its plan to have a pooling of interests. Petitioners also differ from the taxpayer in West Coast Marketing Corp. in the purpose behind their incorporation. In West Coast Marketing Corp.,Manatee was not formed for a business purpose but was instead formed when the sale of land to Universal was imminent to serve as a conduit for passing title to Universal. Manatee did not engage in any business activities and was dissolved shortly thereafter. In contrast, petitioner formulated the intent to manufacture Dispersalloy in corporate form as early as 1970 when he first filed the articles of incorporation for ASMP. He did, however, operate ASMP as a sole proprietorship instead of as a corporation because the manufacture of Dispersalloy did not prove profitable at first and he wanted to, individually, take advantage of ASMP's losses. When Dispersalloy began to make a profit petitioner again thought of operating in *579 corporate form to gain the tax benefits that were not afforded to a sole proprietorship, and he decided to revitalize ASMP. Petitioner stated that in his negotiations with J&J they suggested that he incorporate to facilitate their attempts at seeking a pooling of interests, and that Dispersalloy would be a more beneficial name for the corporation. Altfest stated that when petitioner decided to incorporate it was for several reasons including the following: 1) that J&J wanted Dispersalloy to incorporate to help effectuate J&J's pooling of interests; 2) that he and petitioner felt that any other company that sought to manufacture Dispersalloy would want a pooling of interests which necessitated that the business be incorporated; and 3) that, due to Dispersalloy's profits, sound tax planning required that the business be operated in corporate form. After Dispersalloy was incorporated and its stock exchanged for stock of J&J it continued in operation for almost three years. Based upon the above discussion, we do not find West Coast Marketing Corp. to be controlling as regards the characterization of petitioners' transaction. Rev. Rul. 70-140, 1970-1 C.B. 73, is also distinguishable *580 from petitioners' situation. In Rev. Rul. 70-140, A, an individual owned all of the outstanding stock of X corporation. A also operated a sole proprietorship. Y, an unrelated corporation, made an agreement with A that A would transfer the assets of his sole proprietorship to X for X stock. A then transferred all of his X stock to Y for Y voting stock. The ruling holds that the two steps of the transaction was part of a prearranged integrated plan and were thus "stepped together" to reflect the true nature of the transaction which was a sale by A of his assets to Y followed by a transfer of these assets by Y to the capital of X. This ruling is similar to the facts of West Coast Marketing Corp. and is thus distinguishable from petitioners' transaction for some of the same reasons. The facts of the ruling illustrate a transaction that was conducted pursuant to a prearranged plan with X serving as a mere conduit for the transfer of A's assets from X to Y in order to attempt a tax-free transaction. As noted previously, petitioners did not incorporate and then conduct an exchange of stock with J&J pursuant to a prearranged plan. Petitioners had independent valid business purposes for *581 incorporating. Moreover, Dispersalloy, Inc. was not a mere conduit. Dispersalloy, Inc. operated for almost three years after the agreement with J&J was finalized. Respondent makes much of the fact that at one point the parties to the transaction all viewed it as taxable. Respondent also points out that J&J continued to view the transaction as taxable even after the private placement provision was eliminated. We have carefully considered the testimony of J&J's representatives and have determined that it does not alter our decision. The testimony of the J&J representatives is colored by the fact that the tax treatment they were seeking in the transaction is opposite to that of petitioners. Viewing the facts of the instant case in light of the steptransaction doctrine we are not persuaded that the doctrine is applicable under any of its various tests. Under the "end result" test, for reasons previously discussed, we are not convinced that when petitioners incorporated Dispersalloy they intended for the end result of their transaction to be a sale of their assets to J&J for stock. Petitioners had expressed an intent to incorporate their business as early as 1970 when they incorporated *582 ASMP. They stated that they decided during their negotiations with J&J that they would incorporate whether or not they ultimately reached an agreement with J&J because they wanted to obtain the tax benefits that were inherent in a corporation and they wanted to make Dispersalloy attractive to any publicly held corporation that might be interested in a pooling of interests. Accordingly, we are not convinced that it was petitioners' purpose in incorporating Dispersalloy, Inc. to arrange a tax-free sale of their assets for J&J stock. Under the interdependence test it is clear that petitioners intended to incorporate whether or not they finalized an agreement with J&J for an exchange of stock.The incorporation of Dispersalloy would therefore not have been fruitless without the exchange of stock. Accordingly, petitioners' transaction does not run afoul of the interdependence test. Moreover, petitioners did not have a binding commitment with J&J to exchange the stock of Dispersalloy for the stock of J&J prior to the incorporation of Dispersalloy. The incorporation of Dispersalloy was a separate transaction.It was not until sometime after the incorporation of Dispersalloy that petitioners *583 reached a definitive agreement with J&J to exchange stock. Therefore, once they had incorporated Dispersalloy petitioners were free to carry on the manufacture of Dispersalloy. After a consideration of the relevant authorities we have determined that the transaction in the instant case is controlled by our decision in Vest v. Commissioner,57 T.C. 128 (1971), affd. in part, revd. on another issue 481 F.2d 238 (5th Cir. 1973), cert. denied 414 U.S. 1092 (1973). In Vest, the taxpayers organized a corporation, V Bar, for the purpose of correcting certain title problems in some land interests and to develop the mineral interests in the land. At the time the corporation was formed the taxpayers were unaware that an exchange of stock was being contemplated between V Bar, and Standard, an unrelated corporation that was interested in a lease of the oil and gas rights on taxpayers' land. The taxpayers' attorney had discussed the possibility of an exchange of stock with a representative from Standard but had not informed the taxpayers of this possibility. V Bar was incorporated on July 21, 1965. On August 25, 1965 a plan of reorganization was signed by Standard and V Bar that provided for *584 an exchange of stock. V Bar did not engage in any business operations and was dissolved shortly after the reorganization occured. Despite the close proximity of the incorporation of V Bar, to the exchange of V Bar stock for Standard stock, we held that the step-transaction doctrine was inapplicable. We held thusly because there was a business purpose for the formation of V Bar, I.e., to develop the mineral rights of the taxpayers' properties and to resolve the title problems inherent in those properties. Vest v. Commissioner,supra at 143-146. It is equally true in the instant case that petitioners had a business purpose for incorporating Dispersalloy -- a purpose that was formulated as early as 1970. That purpose was to market Dispersalloy in corporate form and to obtain the tax benefits of a corporate form that were unavailable to a sole proprietorship. Moreover, in the event that Dispersalloy, Inc. should reach an agreement with another corporation for the manufacture of Dispersalloy, then Dispersalloy, Inc. would be in corporate form which would facilitate a pooling of interests. The fact that Dispersalloy, Inc. was incorporated for a business purpose is evidenced by the fact *585 that it continued conducting business operations for almost three years after the exchange of stock with J&J occurred. We therefore conclude that Dispersalloy, Inc. was organized for substantial business purposes. Hence, we agree with petitioner [20] that the transaction herein was effective as a tax-free reorganization. The parties have stipulated that petitioners are entitled to a deduction in 1974 for an investment tax credit carryback from 1977 in the amount of $20,845. It is so found. Decision will be entered under Rule 155.
Footnotes
1. Respondent had also originally disallowed for lack of substantiation a deduction of $20,845 in 1974 as a carryback of an investment tax credit from petitioners' 1977 taxable year. After the trial was held in this case, the record was left open for thirty days to allow petitioners time to present evidence substantiating their 1977 investment tax credit. Respondent now concedes this issue. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. All references to "petitioner" refer to Maurice M. Weikel. ↩
4. Petitioners also filed a timely Form 3468 for the taxable year 1977 showing a tentative investment tax credit of $22,744. On or about June 22, 1979, petitioners filed an amended return for 1974 showing a carryback of investment tax credit of $20,845 from 1977 and claiming a refund in 1974 for that amount. As noted supra↩ at n. 1, respondent at first denied this refund claim for lack of substantiation, but now concedes the issue since petitioner has provided evidence of substantiation.
5. If the transaction here involved does not qualify as a taxfree reorganization petitioners' gross income was in excess of 25 percent of the gross income reported on their return for 1974. Therefore, the agreement to extend the statute of limitations will be effective.
6. In addition to holding the rights to market Dispersalloy, petitioner held the patent rights on Disposacap. Disposacap was a prepackaged product of alloy and mercury. It was conveniently packaged in a small plastic capsule that was easily mixed and then placed in the patient. The rights to Disposacap were transferred to Dispersalloy, Inc. along with those of Dispersalloy.↩
7. In addition to Dispersalloy, petitioner salvaged and marketed low grade dental alloys under the fictitious business name "N K Metals, Inc." Petitioner's net profits for ASMP and N K Metals during the years he acted as a sole proprietor were as follows: ↩
Net profit
Year
or loss
1970
(8,517)
1971
(93,803)
1972
38,878 1973 (10 months)
121,977 8. During its negotiations with petitioners, J&J utilized the following individuals: Name
Position
R. L. MacKenzie
President
Martin Stein
Vice president
A. F. Ring, Jr.
Vice president
George Frazza
Attorney
We do not differentiate which individuals were present on J&J's behalf at the different stages in the negotiations principally because the record is unclear and the parties differ in their recollections.↩
9. There was also testimony at trial by Altfest that the name "Dispersalloy, Inc." was chosen in order to protect the trademark or trade name. However, this comment was not discussed further.↩
10. The record does not reveal the purpose of this loan. We assume that it would be to assist in the manufacture of Dispersalloy.↩
11. A "pooling of interests" is a term of art used by the accounting profession to describe the situation where a merger or consolidation of two business combinations occurs and the assets, liabilities, and shareholders's equity of the two combinations form a single, lrge, economic unit. Seidler and Carmichael, Accountant's Handbook, Vol. 2, at 30 (6th ed. 1981). A pooling of interests is advantageous for a large company that wants to acquire a smaller subsidiary because with a pooling of interests the subsidiary can continue its separate identity for accounting purposes. The parent receives the subsidiary's assets at book value with no step-up in basis. In addition, the parent would not have to capitalize the acquired corporation's goodwill. 12. This figure did not include the sale of tangible assets but did include amounts for goodwill. ↩
13. There is some dispute between the parties as to whether an agreement was ever reached in regard to private placement of the J&J stock. This dispute has no effect upon our ultimate decision.↩
14. Western consented to petitioner's transfer of his rights to market Dispersalloy to a corporation to be formed by petitioner. J&J reached an agreement with Western regarding this transfer on October 9, 1973. J&J had to arrange for the additional rights to market Dispersalloy in Canada and the eastern hemisphere. ↩
15. None of the assets of N K Metals were transferred to Dispersalloy, Inc. Petitioners' total cost basis in the transferred assets was $395,695. The liabilities assumed by Dispersalloy, Inc. amounted to $38,742. Petitioners received 200 shares of Dispersalloy, Inc. common stock for their transferred assets. ↩
16. Altfest mentioned the possibility of deferring some income until the next calendar year if Dispersalloy was on an accrual basis.↩
17. There is a dispute between J&J and petitioner concerning who was to pay for the costs of the placement of the stock. This dispute has no affect upon our ultimate decision.↩
18. Petitioners have sold 58 percent of the J&J stock that they originally received. A three for one stock split of the J&J stock occurred in 1981. Petitioners now hold 61,194 shares of J&J stock or 20,398 on a pre-split basis of the original 48,898 shares.
19. For example, if two transactions occur within an hour of each other it would be reasonable to assume that the second transaction was prearranged given the fact that it would be difficult to conceive and execute the second transaction in the interval of time available. Mintz and Plumb, supra.↩
20. Since we have agreed with petitioners' main contention, we need not reach their alternative argument and therefore express no opinion on this issue.↩